SAMUEL R. PERRY, APPELLEE, V. H. BERGER, APPELLANT.

FILED JANUARY 5, 1910. No. 15,858.

1. **Action:** CONTRACT: PUBLIC POLICY. "An action cannot be maintained for the consideration of a contract upon an alleged performance by the plaintiff, if such contract is against public policy." *Clarke v. Omaha & S. W. R. Co.,* 5 Neb. 314.

2. ——: ——: ——. "If such contract is fully executed the court will not disturb it, but leave the parties to abide the consequences." *Clarke v Omaha & S. W. R. Co.,* 5 Neb. 314.

APPEAL from the district court for Dawson county: BRUNO O. HOSTETLER, JUDGE. *Reversed with directions.*

*John H. Linderman* and *Warrington & Stewart,* for appellant.

*E. A. Cook, contra.*

FAWCETT, J.

Plaintiff alleges substantially that defendant and one George P. Lewis, agent of and representing defendant, demanded that plaintiff pay to defendant the sum of $200 "as a condition of the defendant not prosecuting the plaintiff for stealing certain cattle which the defendant, through the said George P. Lewis, alleged that the plain-

tiff had stolen from the defendant"; that plaintiff was greatly "scared" by said threat to have him arrested and prosecuted on a charge of stealing, and requested that he be given time to consult with some of his friends in reference to the demand for said money, but was met with the additional threat that, if said money was not paid at once, he would be arrested for stealing; that to avoid the threatened arrest and the humiliation growing out of the same he paid to said Lewis for defendant the sum of $200; that the charge made against him by defendant, through Lewis, was false and wholly untrue; that he had not stolen any cattle or any other property from defendant, "as was well known to the defendant"; that said money was only paid because he "was afraid of said arrest by reason of the humiliation that would be caused him thereby and supposed that the defendant would carry out said threat and cause such arrest"; that he did not owe said sum of $200 or any part thereof to defendant, and that said sum of $200 was wrongfully and illegally demanded and received by the defendant from the plaintiff to the plaintiff's damage in the sum of $200.

The answer admits the payment to defendant of the sum of $200, and alleges that the money was paid to him voluntarily by plaintiff in satisfaction of a debt then claimed by him to be due and owing by plaintiff; that plaintiff had not prior to the commencement of the action made any demand for the payment of the money; that on September 17, 1906, plaintiff obtained possession of four head of cattle, the property of defendant, without the knowledge of defendant, "and that the plaintiff concealed from the defendant; that the said cattle were then in his possession, falsely and fraudulently"; that defendant "was compelled to expend time and a large sum of money, to the extent and amount of $50, in the search for the said cattle, as the plaintiff then well knew, and yet falsely and fraudulently concealed from the defendant that the said cattle were then in his possession"; that defendant learned of plaintiff's possession of said cattle on or about October

22, 1907; that at said time plaintiff had said cattle, with others belonging to plaintiff, at Overton, and was about to ship the same to market; that defendant demanded said cattle, or payment for the same, before they "should be so shipped to market, and out of this county"; that plaintiff "thereupon offered to pay to the defendant the said sum of $200 in satisfaction of the debt owed by the plaintiff by reason of the damages suffered by the defendant by reason of the false and fraudulent concealment by the plaintiff of his possession of the said cattle of the defendant, and as the price of said cattle; that the defendant thereupon sold the same to the plaintiff, and permitted him to ship the same to market and dispose of the same, and accepted from the plaintiff the said sum of $200 so offered in payment of said damages and for the said cattle." The reply is a general denial. There was a trial to the court and a jury, which resulted in a verdict and judgment for plaintiff for the full sum claimed, and defendant appeals.

Plaintiff's own testimony precludes a recovery by him in this action. It shows that he attended a sale of stock by defendant on defendant's farm, in September, 1906; that he purchased at that sale 27 head of heifers. "Q. I will ask you to state to the jury how they were put up, whether separately or as an entire bunch? A. They were put up and sold in a bunch of 27 head in a bunch. I bought them by the head, bid them in at $14.75 a head. * * * Q. How many head of cattle did you settle for? A. Twenty-seven head. * * * Q. When you started to get the cattle, did you say anything to Mr. Berger? A. Yes; I asked him to help me drive them out. He said no, he hadn't time; that I got all the heifers there was there, all the heifers he had was put up in that bunch and sold, for me to drive them all out. Q. Did you drive out all the heifers that were there? A. I did. * * * Q. When you took them out, did you count them? A. I counted them after I got them out, drove them all out, and then counted them after I got them out. Q. Where

were you when you counted them? A. On the north side of the lot. Q. How many did you get? A. Twenty-eight. * * * Q. Were all the 28 head taken out of this one lot? A. Yes; and there was two or three taken out of the bunch of steers and drove into this lot and then drove out with the rest of them." He then testifies that, when they got about half a mile east of the house, one young heifer "left the bunch. We couldn't keep it in. I guess they were just weaning it. We tried to keep it in, but couldn't, and we let it go back." He then testifies that he got the other 27 head to his place; that he counted them next morning and there were 27 head. "Q. Did you do anything more about that heifer that went back? A. Yes. Q. What about that? A. Sold it to Mr. Galloway (father of the young man who was helping to drive the cattle). Q. Why did you sell it to Mr. Galloway? A. Well, I tried to sell it to his son when we were driving home. I offered it to him for $7. It was a small one, either $7 or $7.50. I thought it was a wild one, but I guess it proved not to be a wild one, it was just weaned. Q. Upon what theory did you sell that one when you say you had bought 27 head? A. Because I thought it belonged to me when he told me to take them all." Coming to the time he paid the $200 to defendant, he testified that Lewis first suggested the payment of money that day "to fix up with Berger. * * * Q. What did he say? A. Why, he understood I had got hold of more cattle than I was entitled to and I had better settle for them; that they would have me prosecuted and put it into the hands of the government as it was a government offense. He asked me if I hadn't got one. I told him, 'Yes; I had got one more than I bought.' He said he had proof that there was more missing; that there was four head missing, and I would stand good for all of them as long as I had owned up that I had got one; and he said Berger didn't care whether I settled or not because, if I didn't, he would put it into the hands of the government and it would cost me $1,200, and the best thing I could do was to pay his de-

mand, $200, and settle with him.  Q.  What reply did you make to that?  A.  I told him I didn't know what to do. I had simply got one.  If that was the easiest way for me to get out of it I would settle, any way to make it right. Q.  What did you say in reference to the statement that you had gotten four head that didn't belong to you?  A. Told him I hadn't, just got one.  Q.  Did you say what one it was and under what circumstances you got that?  A. Yes; it was a heifer.  He told me to drive them all out, I had got the whole bunch.  Q.  When he told you you would be prosecuted, what did you say to that?  A.  I told him I didn't want to be prosecuted.  Q.  What did he say then? A.  He said that would be done if I didn't pay it.  *  *  * Q.  What was the result of that conversation?  What did you agree to do, if anything?  A. ·I agreed to pay him $200 if they would settle up and keep from being arrested. Mr. Lewis said he didn't know whether that would satisfy or not, he would go and see."  He then testified that he went to the bank and got the money, and went to a restaurant, where he met Lewis and Berger.  "Q.  When you went into the restaurant did you have any money with you?  A. Yes.  Q.  How much?  A. $200.  Q.  What did you do with it?  A.  Gave it to Mr. Lewis.  Q.  Where was Mr. Berger then?  A.  In the restaurant there by him.  Q. When you gave Lewis this money, did you owe Mr. Berger any sum of money?  A.  No, sir.  Q.  Has this money or any part of it been returned to you?  A.  No, sir."

On cross-examination he testified:  "Q.  Did you see Berger from the time of the sale up to the time you met him in Overton?  A.  I had seen him in town, never spoke to him.  Q.  Had you ever had any conversation with him? A.  No, sir; not that I know of.  Q.  Didn't you have a telephone conversation with him a couple of days after the sale?  A.  Next day, over the 'phone.  Q. He asked you, did he not, over the 'phone if you didn't have more cattle than belonged to you?  A.  Yes.  Q.  What did you tell him? A.  I told him, 'No, sir.'  He wanted to know if I had a steer in the bunch, that is what he asked me.  I told him,

'No,' he had better come down and look the bunch over and see." * * * "Q. Isn't it a fact that Berger wrote you a receipt, and that the first receipt he wrote you was unsatisfactory? A. Yes. Q. And didn't you tell him you wanted a receipt for 31 head of cattle? A. Yes. Q. And then he wrote you another receipt, did he? A. The number he went to write down was 28 head, and I says, 'You accused me of stealing 4 head. Put down the whole amount.' And he just wrote down the number. Q. It was all on one paper? A. Yes." The receipt was produced by plaintiff's attorney, identified and introduced in evidence, as follows: "Lexington, Neb., Oct. 22, 1907. Received from S. R. Perry, balance in full due me on 31 head cattle purchased from me Sept. 17, 1906. H. Berger." "Q. It was at your suggestion that the number 31 was put in there? A. Yes, because he accused me of stealing that many. Q. You told him in the restaurant that it was because he accused you of stealing 4 head that you wanted that put in there? A. Yes, sir." * * * "Q. When Berger telephoned you, you didn't tell him anything about having taken an extra animal, did you? A. No, sir. Q. You just simply told him there wasn't any steer down there? A. Yes, that is all he asked. Q. And you told him to come down and look over the herd? A. Yes, sir. Q. As a matter of fact, you knew there was only 27 head there at that time, did you? A. Yes, sir."

In considering the case upon plaintiff's testimony alone, we are giving him the full benefit of the findings of the jury as to three of the four head of cattle in controversy; but we do not see how that in any manner changes the result. The only difference in the eye of the law between taking one head and four is in degree. In either case the act was wrong. His evidence shows that he bought 27 head of heifers at $14.75 a head, and on the evening of the same day drove away from defendant's premises 28 head. He did not settle for the animals purchased until the next day, when he went to the clerk of the sale at the bank in Overton and paid for 27 head only. He took 27 head to

his own farm, and sold the other one and received the money therefor. He said nothing to the clerk of the sale when he settled for the cattle about having driven away one head more than he had bought and was paying for. When defendant asked him, the day after the sale, if he had any extra cattle, or, as plaintiff puts it, if he had a steer in his bunch, he answered, "No," but said nothing to defendant about having driven away 28 head instead of 27. For 13 months, or thereabouts, he concealed the fact of his having driven away more cattle than he had bought, and then did not disclose the fact to defendant until defendant and Lewis accused him of the matter at Overton on the day he paid over the money in controversy. His statement that he supposed he had a right to take away 28 head of heifers, because the defendant told him he had bought all the heifers in the lot and for him to drive them out, cannot be construed in any other light than as a mere pretense. He knew he had only bought and paid for 27 head, and when he discovered that he had 28 head in the bunch it was his duty to have immediately separated one from the bunch and put it back in the lot, or, when one broke away from the herd, to have advised defendant of that fact; but instead of doing so he sold it to the father of the young man who was helping him drive the bunch. It is evident from all this that, when defendant and Lewis called upon him at Overton, he knew he had taken something that did not belong to him and had concealed his possession of it for over a year. Then, when he was confronted with the accusation of having taken stock that he was not entitled to, he paid the money in controversy to defendant, as he himself says, for the purpose of avoiding arrest and prosecution. Such an agreement is against public policy, and cannot in any manner be countenanced, or upheld, or abrogated by the court for his benefit. In *Clarke v. Omaha & S. W. R. Co.*, 5 Neb. 314, we said: "An action cannot be maintained for the consideration of a contract upon an alleged performance by the plaintiff, if such contract is against public policy. If such contract

is fully executed the court will not disturb it, but leave the parties to abide the consequences; if it is not executed the court will not lend its aid to carry it into effect." The accusation made against him by defendant and Lewis, that he had stolen cattle, or at least one animal, from defendant, was not without foundation; and it is clear from plaintiff's own testimony that the money was paid "to fix up with Berger." In other words, it was paid to avoid an arrest and prosecution for an offense which he felt he had committed. Under such circumstances he is not entitled to any relief.

As, under plaintiff's own testimony, there is no theory upon which he can ever recover in this case, the judgment of the district court is reversed and the cause remanded, with directions to that court to dismiss plaintiff's action.

REVERSED AND DISMISSED.

LETTON, J. I concur in the conclusion.