State, ex rel. Spillman, v. First Bank of Nickerson.

Since no error prejudicial to plaintiff has been found, the judgment of the district court is

AFFIRMED.

---

STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, V.
FIRST BANK OF NICKERSON, APPELLEE: C. L. WALDRON,
INTERVENER, CLAIMANT, APPELLANT.

FILED MARCH 3, 1926.   No. 24599.

1. **Contracts: ILLEGAL CONTRACTS.** The law guards with zealous watchfulness each avenue leading to its courts, and refuses to enforce contracts, the tendency of which is to tempt interference therewith.

2. ————: ————. Our statutes having fixed the amount to be paid matter of fact witnesses residing within the jurisdiction of the court and subject to its process, for their attendance at trial therein, a special contract to pay such witnesses more than the regular witness fee is illegal. contrary to public policy, and void.

3. ————: ————. The contract's "validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance." 13 C. J. 424, sec. 360.

APPEAL from the district court for Dodge county: FREDERICK W. BUTTON, JUDGE. *Affirmed.*

*Magney & Magney, Saxton, Waldron & Hammes* and *John P. Breen,* for appellant.

*Cain & Johnson* and *C. M. Skiles, contra.*

Heard before MORRISSEY, C. J., ROSE, DAY, GOOD, THOMPSON and EBERLY, JJ.

THOMPSON, J.

In this case the First Bank of Nickerson, while a going concern, received a deposit in the sum of $1,700, issuing two respective certificates therefor, dated March 21, 1923, one for $700 and the other for $1,000, payable six months

after date, interest at 4 per cent. each, payable to Lloyd Magney and C. E. Negus. The bank in the meantime became insolvent, and was so adjudged by the district court for Dodge county, and a receiver was appointed to wind up its affairs. C. L. Waldron, claiming to be the owner of these certificates by indorsement of Magney and Negus, presented the same to the receiver for payment. Payment being refused, he asked and was permitted to intervene in the suit by way of an amended petition, to which an answer was interposed, and a reply to such answer was filed. On the issues so joined, the case was tried to the court, and judgment rendered allowing such claim as against the general assets of the bank, but denying its payment out of the guarantee fund. A motion for new trial was filed, overruled, and claimant appeals. Appellant challenges the judgment of the trial court for the following reasons: First, that the judgment is not supported by the evidence; and, second, that the judgment is contrary to law.

The administration of our courts is one which involves the interests of every citizen, and, being of such general purpose, we shall quote from the pleadings and evidence at a greater length than usual.

That part of the amended petition which is material to our consideration here is paragraph 2 thereof, which reads as follows:

"2. That said certificates of deposit were made payable to Lloyd Magney and C. E. Negus for the following reasons: That said Lloyd Magney and this petitioner, in their professional capacities as attorneys at law, represented a client, whose name is not desired to be given, for the reason that such information is privileged in character, and said client was engaged in a business transaction which made it necessary for him to place the sum of $1,700 in escrow in some safe place of deposit so that said sum might be at all times available and at the same time not subject to withdrawal either by such client, his attorneys, or the other party to the transaction; that, in order to effect such arrangement, the plan was evolved of placing the money on

deposit in the First Bank of Nickerson, Nickerson, Nebraska, and taking such bank's certificates of deposit made payable to. Lloyd Magney, as the representative of one side, and C. E. Negus, who was acquainted with the Fremont, Nebraska, party, as the representative of the other side, and possession of said certificates to remain with this petitioner, so that said certificates would have to be indorsed by both sides before the same could be cashed; that whether the money should go to the one or the other depended upon the result of a suit then pending in the supreme court of Nebraska, but your petitioner alleges. that the only duty or contract of said bank was to pay the said certificates whenever the same should be presented properly indorsed, with interest at 4 per cent., if said money remained on deposit a minimum period of six months from date; that said C. E. Negus acted merely as a representative or agent of the Fremont party in his individual capacity, and not as an officer of said bank, in being so named as payee, and was obligated only to indorse said certificates when said suit should be finally decided in the supreme court of Nebraska, and at no time did the said C. E. Negus have any interest whatsoever in said certificates or the fund represented thereby, nor was he in any way instrumental in or responsible for the deposit of said funds in said First Bank of Nickerson, Nickerson, Nebraska, the arrangements between petitioner's client and the Fremont party having been fully consummated without consultation with said C. E. Negus until the cash was actually deposited in said bank; and your petitioner further alleges that said First Bank of Nickerson made no arrangement, agreement or contract whatsoever except to pay the sum of $1,700 which it received in full in cash, upon the return of said certificates of deposit properly indorsed."

To this petition the receiver filed an answer, which reads as follows:

"Comes now Emil Folda, receiver of said defendant bank, and, for answer to the amended petition of intervention of C. L. Waldron, respectfully shows to the court that the

426    NEBRASKA REPORTS.    [VOL. 114

State, ex rel. Spillman, v. First Bank of Nickerson.

certificates of deposit set forth in said amended petition and representing a sum of money left in said bank under the circumstances set forth in said amended petition did not constitute a deposit within the depositors' guaranty law of the state of Nebraska, and is not a preferred claim payable out of the depositors' guarantee fund, for the reason that said bank was acting as a stakeholder in an illegal transaction, and same was not a transaction in the usual course of banking business, but was contrary to public morals. Wherefore, this receiver prays that said claim may be disallowed and that he may go hence without day and recover his costs."

To which answer, Waldron filed a reply, which is as follows:

"Comes now C. L. Waldron, intervener herein, and while alleging that the answer of the receiver filed herein as to the claim of C. L. Waldron does not state facts sufficient to constitute a defense as against intervener's claim, and while not waiving his rights by reason thereof, and still reserving the same, for reply to said answer of the receiver herein, (1) denies each and every allegation, matter and things in said answer contained, not herein admitted or heretofore alleged in said claimant's amended petition of intervention, and to that end particularly denies that any illegal transaction was involved or that any transaction was involved contrary to public morals."

The court will take judicial notice that the city of Omaha is in Douglas county; that the city of Fremont is about 40 miles north and west and in Dodge county; and that the village of Nickerson is north of Fremont, and in the same county.

In substance, the evidence shows that Dr. John T. Mathews had been arrested, charged in the district court for Douglas county with a felony, to wit, murder in the commission of an abortion on a young woman. Waldron and Magney were his attorneys at the trial. Trial was had and a verdict of guilty returned. A motion for new trial was filed and pending. In the course of the trial these

attorneys had become informed that the young woman, on her way to Omaha, had stopped in Fremont, with the women, Mrs. Watkins and Mrs. Christofferson, or one of them. These attorneys proceeded to Fremont and met these women. They disclosed to the attorneys what they knew about the young woman's having stopped there, and had, prior to her going to Omaha, attempted to commit an abortion upon herself. The attorneys told the women that they wanted them to go to Omaha and testify in the case, if a new trial was granted, as witnesses on the part of the defendant Mathews. The women stated they did not want to go, as it would be too expensive. Then the attorneys told them that, if they would appear at the trial, they would pay them all the expenses thus incurred. The women stated that they had no assurance of that. Then the attorneys told them that they had $1,700 that they would put in a bank and deposit it in such a way as the same could not be paid out without their knowledge and consent. Then the question came up as to what bank to put the money in. One of the women said she was acquainted with Mr. Negus, vice-president of the First Bank of Nickerson. The attorneys, or whichever one was present at the time, returned to Omaha, and informed Negus at Nickerson to meet them in Fremont with two blank certificates of deposit. In furtherance of this arrangement with Negus and the women, Waldron took $1,700 in currency, and he and Magney went to Fremont, and met Negus with the certificates of deposit, informed him that they desired to deposit the $1,700 in two separate amounts, $1,000 to be covered by one certificate, and $700 by another, that Mrs. Watkins and Mrs. Christofferson were interested in the deposit, and that therefore the certificates should be made payable to Magney, who could represent the attorneys, and to Negus who could represent the women, and that the money should not be paid out until requested by the two women. The certificates were signed by Negus as vice-president of the bank, and ran to him as C. E. Negus, and to Lloyd Magney. At this time, and before returning to

Omaha, the attorneys procured the affidavits of the women, covering what they knew, or a part thereof, as to the young woman in question. These affidavits were taken by the attorneys and filed with the court in the case. The case came on for hearing on the motion for new trial, and the same was overruled, and was brought on error to this court; the case being the one reported in *Mathews v. State*, 111 Neb. 593. The judgment of the trial court was affirmed, and, thereafter, just how Negus and Magney happened to indorse the certificates, or when and where they did it, is not known. But the evidence of Waldron at the trial was that they each had indorsed them, and after such indorsement he had presented them for payment; payment was refused, and they were protested for nonpayment. This leaves the sole question to be determined by this evidence: Was the arrangement as made illegal, contrary to public policy, and of such a nature as to prevent recovery on the part of these attorneys?

It will be seen from paragraph 2 of the amended petition above quoted that the money involved, at and before the time of the deposit at least, was the money of the accused, and the then found guilty, doctor; that the business transaction mentioned in said paragraph was that involved herein; that Negus was at all times acting for and on behalf of the bank, and also for the women as to the deposit. Negus, as vice-president of the bank, went to Fremont, wrote the certificates, signed them, received and deposited the money as such representative of the bank. And, as stated in the petition, as well as shown by the evidence, Negus was the agent and representative of the women, and an important instrumentality in the involved scheme. The law gave to defendant Mathews the right to force the attendance of these witnesses by way of a subpoena, and fixed the amount of their compensation. This, the parties are conclusively presumed to have known. The women refused to attend, or indicated their desire not to, as they could not afford to for the fees provided by statute; thus, the agreement to pay their entire expense, the amount of which was

left to them to determine. That the amount for that pur-
pose was to be liberal is evidenced by the placing before
them at all times and under their control the $1,700. This
agreement was not one wherein the witnesses possessed any
particular skill or ability, or who were to so inform them-
selves. Neither were they, nor had they been, put to any
effort in acquiring the knowledge being sought. These
claimants told the women what they wanted the evidence
for, and the women told them what they knew. The temp-
tation to induce lack of disclosure of all they knew, or to
color or add to what they knew, was too alluring to be
held in furtherance of justice. Its tendency is to work a
denial of due process of law. It is not necessary for us
to find that the intent of the contract was to procure per-
jury, but that the contract had the tendency and opened a
strong temptation to the procurement of perjury. The ten-
dency of such arrangements is to pervert justice, to bring
courts into disrepute, and to cause a lack of confidence
therein. The maintenance of such confidence is funda-
mentally necessary to the promotion of our institutions, and
to foster or permit such transactions is to undermine them.

Such agreements would lead to the suspicion of each and
every witness presented, thus demanding that each be in-
terrogated as to what secret arrangements he had with
attorneys or clients as to his compensation. To even ask
which, under our present practice, would be to insult the
witness and lay such attorney open to court censure, if not
more severe punishment, so clean has been our court pro-
cedure and conception of duty. The suggestion of such a
practice is objectionable and fraught with many dangers.
Witnesses, like jurors and court officers, owe a duty to the
state to aid in the due administration of affairs of govern-
ment, for such compensation as the law provides. The least
tendency to the contrary should not be tolerated, however
innocent the claimed intent. Even now a layman's evi-
dence, with but knowledge gained by experience, carries
more weight often than that of an expert who has qualified
himself by years of study, as well as by experience, simply

**430** **NEBRASKA REPORTS.** **[VOL. 114**

State, ex rel. Spillman, v. First Bank of Nickerson.

for the reason that it is believed that the former is unbought, and the fear that such might not be true of the latter. If experts could but realize this, they too would more truly sense the duty they owe, as such witnesses, to their profession, as well as to the state, and at least let the court fix their compensation so they could so answer if interrogated.

It is well said in 13 C. J. 424, sec. 360: "If an agreement binds the parties or either of them to do, or if the consideration is to do, something opposed to the public policy of the state or nation, it is illegal and absolutely void, however solemnly made. * * * Where a contract belongs to this class, it will be declared void, although in the particular instance no injury to the public may have resulted. In other words, its validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance."

As is well said in *Ramschasel's Estate*, 24 Pa. Sup. Ct. 262: "The law having fixed the amount to be paid witnesses for their attendance upon a court, a special contract to pay more than the regular witness fee, in ordinary cases, is void for want of consideration, and as being against public policy." See, also, opinion in the case just quoted from, page 265.

"A contract to pay a fact witness for his loss of time occasioned by reason of his having to testify is against public policy and void." *Wright v. Somers*, 125 Ill. App. 256.

"Where a witness who is not interested in the result of the controversy resides within the state and is amenable to process therein, an agreement to compensate him in an amount in excess of the legal fees for attending as a witness and testifying only as to facts within his knowledge is contrary to public policy and void." *Clifford v. Hughes*, 124 N. Y. Supp. 478. See, also, *Neece v. Joseph*, 95 Ark.

552, 30 L. R. A. n.s. 278, and note, p. 280; *Thatcher v. Darr*, 27 Wyo. 452, 16 A. L. R. 1442, 1458; 6 R. C. L. 757, sec. 165.

It must further be remembered that the only witness called in this case was the claimant himself; that in response to a question asked by his associate Magney, the substance of which was whether or not the women were to get more if the case was finally won for the doctor than if it was lost, he answered, "Yes." No direct question was asked him in reference to such answer. However, his answers to other questions are seemingly intended to modify it, but the explanatory answers were not at all convincing, and neither was the illustration he used as to his paying a doctor $100 to testify in a compensation case.

"It is an established general principle that contracts having for their subject-matter any interference with the due enforcement of the laws are against public policy, and are therefore void. The law guards with jealousy every avenue to its courts of justice, and strikes down everything in the shape of a contract which may afford a temptation to interfere with its due administration." 6 R. C. L. 757, sec. 165.

The subject-matter and the purpose of the agreement in this case are interlinked with each and all connected with it in such a way as to require the court not to disturb it, but to leave the parties as they are found. See *Langdon v. Conlin*, 67 Neb. 243; *Perry v. Berger*, 85 Neb. 753.

*Deaver v. Bennett*, 29 Neb. 812, and *Ward v. Holliday*, 87 Neb. 607, cited by claimant, each involved money wagered, and are without application to the question here under consideration.

As the receiver failed to cross-appeal from the allowance of this claim as a general one against the trust, we are without jurisdiction to deal with it. The judgment of the trial court is

AFFIRMED.

MORRISSEY, C. J., and DAY, J., dissent.