CUSTER PUBLIC POWER DISTRICT, A PUBLIC CORPORATION, ET AL., APPELLEES AND CROSS-APPELLEES, V. LOUP RIVER PUBLIC POWER DISTRICT, A PUBLIC CORPORATION, ET AL., APPELLEES AND CROSS-APPELLANTS, CONSUMERS PUBLIC POWER DISTRICT, A PUBLIC CORPORATION, ET AL., APPELLANTS AND CROSS-APPELLEES, CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DISTRICT, A PUBLIC CORPORATION, ET AL., APPELLEES AND CROSS-APPELLEES.

75 N. W. 2d 619

Filed March 23, 1956. No. 33920.

*George Healey* and *Richard D. Wilson,* for appellants.

*Evans & Evans, Kenneth M. Olds,* and *Hugh W. Eisenhart,* for appellees Custer Public Power District et al.

*Walter, Albert & Leininger, Crosby, Crosby & Nielsen,* and *Crosby, Pansing & Guenzel,* for appellees Loup River Public Power District et al.

*Beatty, Clarke, Murphy & Morgan* and *Charles W. Baskins,* for appellee City of North Platte.

*John Riddell,* for appellee York County Rural Public Power District.

*Ward W. Minor,* amicus curiae.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action for a declaratory judgment. It involves public power districts organized under the provisions of an act of the 1933 Legislature commonly known as Senate File No. 310, Laws 1933, c. 86, p. 337. As amended the act is now Chapter 70, article 6, R. R. S. 1943.

There were joined, either as parties plaintiff or defendant, all of the power districts organized under the above act, together with other interested defendants and certain interested municipal corporations.

Issues were made and trial was had. There is an appeal and cross-appeal from the decree of the district court. So far as involved here those issues will be stated later in this opinion.

Senate File No. 310 was an act authorizing the creation of public power and irrigation districts, prescribing the manner of their organization and operation, and defining their powers, functions, and franchises. It was

a comprehensive act. As a result of proceedings under it, the privately-owned public power utilities in this state have all passed into some form of public ownership and operation.

Of necessity, preliminary statements of fact must be a general summary.

An early major development under the act was the organization of districts to develop and generate power by water.

The Loup River Public Power District was organized in 1933. It had diversion works at Genoa, 35 miles of canal, and powerhouses near Monroe and Columbus. Its construction was completed in 1937. We will hereinafter refer to this district as Loup.

Platte Valley Public Power and Irrigation District was organized about the same time. It had a diversion dam at Keystone on the North Platte River, with a power plant near the city of North Platte. Its works were completed in 1937 and were put into operation in 1938. We will hereinafter refer to this district as Platte.

The Central Nebraska Public Power and Irrigation District was organized a year or two later than the others with headquarters at Hastings, Nebraska. It produced power from water of the North Platte River. We will hereinafter refer to this district as Central.

When these three hydro power districts were completed, they were in the position of having electric energy to sell, with no firm market to which it could be sold. The privately-owned utilities had their own generating plants and sources of supply.

The hydro districts then considered the purchase of the privately-owned utilities. That was found to be not feasible because of bond obligations and other reasons.

Under the leadership of the officers of Loup, Consumers Public Power District was organized in August 1939. It will hereinafter be referred to as Consumers.

Thereafter, on or before January 1, 1942, Consumers purchased some 14 of the privately-owned public utilities operating in Nebraska. As each utility was purchased, Consumers organized it as an operating division.

In 1940 the Nebraska Public Power System was created by contract by Loup, Platte, and Central. We will hereinafter refer to it as N.P.P.S. This was an operating agreement, "a vehicle," by which the three districts pooled their resources and operating responsibilities, jointly collected and distributed revenue, and bought and sold power. In general Consumers leased its generating facilities to N.P.P.S. and retained the distribution system. Central withdrew from N.P.P.S. in April 1949, and thereafter has sold its power to N.P.P.S.

During this same period of time there was organized under the act a considerable number of rural power districts. These districts will hereinafter be referred to as rurals. Their primary function was to buy power and distribute it to rural patrons. They purchased power from N.P.P.S.

During this period of the growth of public power, there came into existence a series of contracts between Loup, Platte, Central, and Consumers.

In 1946, Consumers, Loup, Central, and Platte entered into an amended and consolidated lease-power agreement. The effective date was March 1, 1946, and it extended to January 2, 1972. This contract, in general, covered the whole field of contract obligations and rates. The specific issue involved in this appeal has its origin in this 1946 agreement.

Thereafter the Loup, Central, and Platte, and after Central's withdrawal, Loup and Platte, were caught in the well-known increase of costs and they had a commodity for sale at a fixed rate.

As of September 1, 1949, Loup, Platte, and Consumers entered into a cost-of-service rate agreement and a supplement to the March 1, 1946, agreement. This agree-

ment, by its terms, becomes involved in the issue here presented.

By 1952 it was recognized by Consumers and N.P.P.S. that the probable future demand for electric power in Nebraska required the securing of an additional and material source of supply. N.P.P.S. proposed to build a generating plant in southeastern Nebraska, contending then and now that the generating of power and the sale of power to Consumers was its contractual right and within the domain of N.P.P.S. as this system of public power had developed in Nebraska.

Consumers contended that it had the right under the terms of its organization powers to build a generating plant to furnish the additional energy, and that it was not under contractual obligation to N.P.P.S. that would prevent it doing so.

The issuance and sale of bonds, to secure the funds to construct a new generating plant, were necessary whether the new facility was to be built by N.P.P.S. or by Consumers. Consumers fortified its position by establishing that its financial structure was such that it could secure the money at a lower rate of interest than could N.P.P.S. Because of that, the saving in interest alone by Consumers' financing would amount to several million dollars.

N.P.P.S. proceeded to issue and was negotiating the sale of bonds when Consumers took the position that it would not buy the additional power if produced by N.P.P.S. Consumers proposed to proceed to build a generating plant to supply itself with additional power for sale to its customers.

This litigation then started, with the purpose of determining the right and power of Consumers in the matter.

As Consumers has developed, it now operates in the western one-third of Nebraska under the designation of its Western System and in the eastern two-thirds of the state under the designation of its Eastern System.

The two systems are not physically connected. This litigation involves the Eastern System.

This brings us to the basic question involved in this appeal.

The March 1, 1946, agreement opened under the title "Witnesseth" with some 20 paragraphs devoted largely to fact recitals followed by "In consideration of the matters hereinbefore recited, and of the mutual covenants and obligations of the parties hereto, it is agreed" etc.

In the nineteenth paragraph of the recitals is this sentence: "It is further recognized that by entering into the contracts hereinafter provided for Consumers District has turned over to Hydro Districts all of its major generating plants and has agreed to buy substantially all of its power requirements from Hydro Districts."

Following the "In consideration" sentence are short provisions that Consumers "shall continue to lease to Hydro Districts" etc.; and that hydro districts "shall continue to furnish electric power and energy to Consumers District" etc. The "Hydro Districts" are shown by the contract to be Loup, Central, and Platte.

In the body of the agreement under Section B, Article IV, under a title "Provisions for Future Facilities" is a provision that hydro districts agree "to have available at all times adequate power to satisfy Consumers District's" requirements, and Consumers "agrees to purchase all of its Eastern System power requirements from Hydro Districts * * *." To each of these covenants are exceptions not material to the solution of the issue here.

Prior to the 1946 agreement, it is patent that Loup, Central, and Platte, in substance, had a monopoly in the generation and sale of power at wholesale to Consumers and the rurals. Consumers had a like monopoly in the distribution and sale of electric power to, or in, over 300 cities and towns in Nebraska. By this

contract the parties undertook to give contractual recognition to the area of each party's monopoly and to extend that recognition for a period of 26 years, or until 1972.

The supplemental agreement of September 1, 1949, was entered into by Consumers, Loup, and Platte, the latter two being designated as "operating districts." The contract opened with "Witnesseth" followed by a series of "Whereas" statements, early in which reference was made to the two covenants quoted immediately above.

Later in the 1949 contract is this provision: "Article IV, Section B of the Lease-Power Contract is hereby amended as follows: Strike all of such Article."

Loup and Platte rely here on the provision in the 1946 agreement which was not stricken in the 1949 supplemental agreement that Consumers "has agreed to buy substantially all of its power requirements from the Hydro Districts."

Loup and Platte contend that provision constitutes a binding, subsisting, present, and continuing obligation of Consumers. Both parties here and in the trial court relied on evidence as to preliminary negotiations leading to both contracts; provisions in both contracts which it is contended lend support to their position; and, in particular, Loup and Platte rely on practical construction by the parties.

The above quotes pinpoint the contractual issue.

The trial court found that Consumers was required to buy substantially all of its power and energy for its Eastern System from N.P.P.S., so long as the latter could furnish it, until the year 1972, with exceptions not material here. The court enjoined Consumers from violating the terms of its contracts as so construed. Preliminary thereto, the court found that "* * * Consumers, may not construct a power plant under the facts and issues as developed in this case * * *."

As appellant here, Consumers contends that the con-

tracts are invalid as against public policy and in any event there is no such contractual obligation.

The procedure for the organization of a district under the provisions of Senate File No. 310, Laws 1933, c. 86, p. 337, was that of the filing of a petition addressed to the Department of Roads and Irrigation, hereinafter referred to as the department. It became the duty of the department to make an investigation of the proposed district and of its proposed plants, systems, and irrigation works, and if deemed by the department feasible and conforming to public convenience and welfare, the petition was to be approved. A certificate in duplicate, setting forth a true copy of the petition and declaring the approval, was then to be filed by the department in the office of the Secretary of State and in the office of the county clerk of the county in which the principal place of business of the district is located. The district then became a body politic and corporate. Under the provisions of this act, the petition, when approved, became in effect the charter of the district. The parties here so treat it.

By amendment in 1937, the Legislature provided: "A district may be organized to engage only in the electric light and power business, or only in the business of owning and operating irrigation works, or to be engaged in both of said businesses." Laws 1937, c. 152, § 3, p. 578 (now section 70-604, R. R. S. 1943).

The Legislature in 1937 referred to the approved petition as a "charter." Laws 1937, c. 152, § 9, p. 589 (now section 70-662, R. R. S. 1943).

The petition for the creation of Consumers proposed the creation of a public power district "to engage in the electric light and power business * * *." The petition recited that the nature of the business in which the district intended to engage was as follows: "The acquiring by purchase or otherwise, the building and construction, the leasing or otherwise holding and op-

erating, of electric facilities, including generating plants, transmission lines, substations, and distribution systems in the manner authorized in said Chapter 86, Laws of Nebraska, 1933, as amended; the purchase, generation, distribution, transmission, and sale of electric energy, either at wholesale or retail, or both, for lighting, power, heating, and every other useful purpose whatsoever; the purchase of electric energy at wholesale from any Public Power or Public Power and Irrigation District and the sale and distribution of the same, either at wholesale or retail, or both; the leasing, purchasing, or otherwise acquiring of the electric facilities of the Northwestern Public Service Company, including generating plant, substations, and distribution systems in the Counties of Platte, Butler, Colfax, and Merrick, used and operated in the City of Columbus, Nebraska, and surrounding territory, commonly referred to as the Columbus Division of said Company, together with franchises, leases, licenses, permits, grants, easements, contracts, customers' accounts receivable, meter deposits, tools, merchandise, machinery, equipment, and miscellaneous other property of said Company used in connection therewith; the leasing, purchasing or otherwise acquiring of such of the electric facilities and appurtenances thereto of such other privately owned electric light and power companies within the State of Nebraska as the District shall deem necessary or expedient in order to fulfill the purpose of its incorporation; the purchasing and selling of appliances, accessories, equipment, and merchandise incident to the operation of an electric light and power business; the leasing, purchasing, or otherwise acquiring of real and personal property needed or useful in connection with any of the above."

There is no contention that Consumers does not have the power, under its charter provision as recited in the petition, to build and operate a generating plant and sell the power therefrom either at wholesale or retail.

The petition for the organization of Consumers recited that the name of the municipality constituting the proposed district shall be the city of Columbus and that the boundaries of the proposed district shall be the same as the boundaries of said city.

Senate File No. 310, Laws 1933, c. 86, § 2, p. 339 (now section 70-602, R. R. S. 1943), provided: "* * * nothing in this act shall be construed to prevent the organization of a district hereunder within, or partly within, the territorial boundaries of another district organized hereunder, so long as the plants, systems and works, the operation of the same, the exercise of powers and the assumption of duties and responsibilities hereunder, of or on the part of one such district, do not nullify, conflict with, or materially affect those of or on the part of another such district."

The Certificate of Approval of the department recited that the city of Columbus was within Loup District; it quoted the statute; and then recited a resolution of the board of directors of Loup containing these two paragraphs: "WHEREAS, the creation of the CONSUMERS PUBLIC POWER DISTRICT, for the purposes in the petition named, and the operation of the plants, systems and works, the exercise of power and the assumption of duties and responsibilities thereunder, of or on the part of such new district, will not nullify, conflict with, or materially affect those of, or on the part of the Loup River Public Power District, * * *.

"BE IT FURTHER RESOLVED, that the Loup River Public Power District cooperate with said proposed new district if and when the same is created, to the end that the purposes enumerated in said petition may be accomplished."

The department then found that the project would be feasible and conform to public convenience and welfare, and approved it subject to three limitations, of which the third is: "That the plants, systems and works, the operation of same, the exercise of powers

and the assumption of duties and responsibilities of the Consumers Public Power District shall not nullify, conflict with, or materially affect those of or on the part of the Loup River Public Power District."

The department by so doing transformed the "do not nullify, conflict with, or materially affect" clause into a prospectively operating "shall not" provision.

The appellees here contend that the statute, and the limiting provision in the approval, bar Consumers from building and operating a power plant and selling electric power so generated, because to do so will conflict with and materially affect their operations.

The statutory provision involved relates to "the organization" of a district within or partly within the territorial boundaries of another district, and permits it so long as it does not nullify, conflict with, or materially affect another district. It is a provision designed to permit the organization of overlapping districts.

We so construed the act in State ex rel. Wright v. Lancaster County Rural P. P. Dist., 130 Neb. 677, 266 N. W. 591. That was an action in quo warranto. The department made no finding that there would be no conflict between two districts operating in the same territory. We held that such a finding was not required. We further held: "The duty of the state department, as imposed by provisions already quoted from the statute, was to make an investigation of the proposed district and of its proposed plants and systems and, if deemed feasible and conforming to public convenience and welfare, to execute, in duplicate, a certificate setting forth a true copy of the petition and declaring it approved. Comp. St. Supp. 1935, sec. 70-703. In this respect the record of organization shows compliance with the statute. The state department made the required investigation and issued certificates declaring that the proposed plants and systems of both districts were 'feasible,' conforming to public convenience and welfare, thus implying and deciding that overlapping will

not create any material conflict within the meaning of the legislative act."

So here it must be held that at the time the department approved Consumers' petition it decided that overlapping would not create any material conflict within the meaning of the act. When the department approved the petition and caused its certificate to be filed, its function in the matter ended.

We further said in State ex rel. Wright v. Lancaster County Rural P. P. Dist., *supra:* "The record fails to show that the powers of the two districts cannot be so exercised as to prevent a material conflict." That statement must be related to the issue involved in the quo warranto proceeding. It relates to the condition of the showing at and prior to the approval of the petition there challenged.

Here the record shows that at the time the department approved the petition of Consumers, there was an affirmative showing before the department, made by Loup, that there was no material conflict.

The statutory provision involved relates to a fact condition that could be held to prevent the organization of a district, and not to a fact condition subsequently arising that could prevent or restrict the operation of an organized district under its charter powers.

We find nothing in the act indicating a legislative intent that the conditions imposed should operate beyond the "organization" of a district. The appellees find comfort in the "so long as" phrase. That phrase is used here in the sense of provided. See Cavanna v. Tri-State Cooperative Assn., 77 Pa. Super. 358.

Is Consumers bound by the prospective condition attached to the approval by the department?

The department's powers and functions are prescribed by the statute. It can exercise only the powers conferred by express enactment or by necessary implication. Scotts Bluff County v. State Board of Equalization & Assessment, 143 Neb. 837, 11 N. W. 2d 453. The ex-

press power conferred is to approve and by implication to disapprove. When it approves, its power ends. Thereafter there remains only the power to certify its approval and file. There is no discretionary power given to the department such as is conferred, for instance, in section 46-235, R. R. S. 1943. It is the petition when approved that becomes the charter of a district. It is the petition when approved that is subject to amendment. § 70-662, R. R. S. 1943.

We find nothing in the act that can be construed to imply a power in the department to condition its approval subject to limitations and conditions running prospectively for the life of the district. It necessarily follows that the restriction imposed by the department on the approval of Consumers' petition was outside its powers and void. It further follows that the organization condition set out in section 70-602, R. R. S. 1943, is of no force and effect subsequent to the approval of Consumers' organization petition.

We come then to the question of whether or not the contract provision in the 1946 agreement of Consumers to buy all of its power from N.P.P.S. is void as against public policy. We are not here dealing with the narrow question of the power of a corporation to contract to buy all of a named commodity from one source of supply. Rather we are here dealing with the power of Consumers, a public corporation, to contract not to exercise for a period of 26 years its charter powers of constructing generating plants, generating electricity, and selling electricity at wholesale or retail.

The public policy of this state as to power districts organized under the provisions of Chapter 70, article 6, R. R. S. 1943, is too well known to require demonstration. It is the concept of electrical energy being furnished to the ultimate consumer at the lowest cost consistent with sound business judgment. It is a matter of public history and common knowledge of which

courts may take judicial notice. There is no contention here to the contrary.

We have here a contract which, if valid, creates a monopoly in N.P.P.S. in the production and furnishing of power. We have a contract which, if valid, requires Consumers to buy substantially all of its electric power from N.P.P.S. If the contract is valid and if N.P.P.S. builds the generating plant to supply Consumers' increased power needs, the cost in interest rates alone to N.P.P.S. and ultimately to the customers of Consumers, will be several million dollars above that which the production of power will cost Consumers and ultimately its customers. There is no adequate showing of material savings that will result from N.P.P.S. production as distinguished from Consumers production sufficient to offset the increased interest rate.

We have here a contract which has implicit in it the evils of a monopoly directly related to a business affected with a public interest. Under the evidence here, to enforce it will not result in the bringing of electrical energy to the ultimate consumer at the lowest possible cost consistent with sound business management.

In State ex rel. Spillman v. First Bank of Nickerson, 114 Neb. 423, 207 N. W. 674, 45 A. L. R. 1418, we applied this rule: " 'If an agreement binds the parties or either of them to do, or if the consideration is to do, something opposed to the public policy of the state or nation, it is illegal and absolutely void, however solemnly made. * * * Where a contract belongs to this class, it will be declared void, although in the particular instance no injury to the public may have resulted. In other words, its validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance.' "

The rule is stated in 73 C. J. S., Public Utilities, § 5, p. 996: "As a general rule, public utilities have the right to enter into contracts between themselves or with others, free from the control or supervision of the state, so long as such contracts are not unconscionable or oppressive and do not impair the obligation of the utility to discharge its public duties."

Also, in 17 C. J. S., Contracts, § 211, p. 563, the rule is stated: "Contracts contrary to public policy, that is those which tend to be injurious to the public or against the public good, are illegal and void, even though actual injury does not result therefrom."

Here it is patent that the contract does impair the obligation of Consumers to discharge its public duties.

The Supreme Court of the United States with reference to illuminating gas as distinguished from electricity has held: "The supplying of illuminating gas is a business of a public nature to meet a public necessity. It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual effort. * * * Hence, while it is justly urged that those rules which say that a given contract is against public policy, should not be arbitrarily extended so as to interfere with the freedom of contract, Printing &c. Registering Co. v. Sampson, L. R. 19 Eq. 462, yet in the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy. * * * It is also too well settled to admit of doubt that a corporation cannot disable itself by contract from performing the public duties which it has undertaken, and by agreement compel itself to make public accommodation or convenience subservient to its private interests." Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 9 S. Ct. 553, 32 L. Ed. 979.

The appellees call our attention to our holding in E. K. Buck Retail Stores v. Harkert, 157 Neb. 867, 62 N. W. 2d 288, wherein we held: "The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt. It is not the province of courts to destroy the right to contract by enabling parties to escape their contractual obligations on the ground of public policy unless the preservation of the public welfare imperatively so demands."

That case had to do with contracts between private parties. Nevertheless we have weighed the problem here in light of the intent of that rule.

We conclude that the contract of Consumers made in 1946 to buy all or substantially all of its electric power from N.P.P.S. was and is contrary to public policy and hence illegal and void. This conclusion renders it unnecessary to determine the impact of the 1949 supplemental agreement.

The trial court erred in holding that Consumers was required to buy substantially all of its electric power from N.P.P.S. and in enjoining Consumers as above stated.

This brings us to the cross-appeal of Loup and Platte.

By cross-petition Loup and Platte prayed for an order terminating the power contracts with the rurals, Consumers, the city of Minden, and the city of North Platte; and directing N.P.P.S. to establish rates for its customers as prescribed by the statutes of Nebraska. Because of admissions made in the pleading, the prayer of the cross-petition of the city of North Platte was granted. That order is not involved in this appeal and is not disturbed by our holding herein.

The trial court denied the cross-petition otherwise. That denial is challenged here, and we are requested to enter a declaratory judgment on the cross-petition.

In 1949 Loup and Platte separately adopted identical

rate resolutions. The purpose of these resolutions was to establish rates for the sale of electrical power. The resolution is lengthy and involved. In form and substance it has the appearance of a legislative act. It created officers of the N.P.P.S., a planning board and a budget board, provided their membership and powers, and set out in detail operations, conditions, and terms.

Based upon these rate resolutions, Consumers, the rurals, and the municipals then entered into cost-of-service contracts with Loup and Platte. An analysis of these resolutions and contracts is not required here. It is sufficient to say that the over-all effect was to guarantee Loup and Platte an income then deemed sufficient to meet their financial needs and to permit the customers of Loup and Platte to have a considerable, if not complete, control over the expenditures of Loup and Platte. It is those contracts which Loup and Platte seek to have terminated by a declaratory judgment on a cross-petition.

One of the purposes of the Uniform Declaratory Judgments Act is to terminate the controversy that gives rise to the proceedings. § 25-21,154, R. R. S. 1943.

The controversy that gave rise to this proceeding was the proposal of Consumers to build and operate a power generating plant. The ultimate question to be determined was whether or not Consumers was contractually bound to buy substantially all of its power from Loup and Platte. That question the trial court determined and on appeal we determine, although with a different result. With that determination the controversy that gave rise to this proceeding has been terminated.

The petition presents basically the construction and validity of one provision of the 1946 contract of Loup, Platte, and Central with Consumers.

The cross-petition presents the construction and validity of provisions in the 1949 rate resolution and cost-of-service contracts of Loup and Platte with the rurals, the municipals, and Consumers.

We have held: "Proceedings under the uniform declaratory judgments act are governed by applicable established rules of pleading." State ex rel. Smrha v. General American Life Ins. Co., 132 Neb. 520, 272 N. W. 555.

In Armstrong v. Mayer, 69 Neb. 187, 95 N. W. 51, we examined at length the question of what matters can be raised by cross-petition in this state. We there held: "But the matters set up in the cross-petition must be germane to the original suit. The cross-petition is not maintainable for purposes of affirmative relief as a cross-suit beyond the requirements of a complete adjudication upon the subject mater (sic) of the original suit."

This decision has since been followed consistently down to and including O'Shea v. O'Shea, 143 Neb. 843, 11 N. W. 2d 540.

Paraphrasing language used in Armstrong v. Mayer, *supra,* in some sense the questions presented by the cross-petition are connected with the subject matter of the petition but the connection is not such a necessary one as to require that a court pass upon them in order to render a complete adjudication of the subject matter of the original controversy.

We have held that under the Uniform Declaratory Judgments Act courts have a reasonable discretion in determining the controversies to which it applies. Phelps County v. City of Holdrege, 133 Neb. 139, 274 N. W. 483.

We have also held: "The use of a declaratory judgment, while discretionary with the court, is nevertheless dependent upon facts and circumstances rendering it useful and necessary. The court's discretion should be exercised with caution. Jurisdiction should be assumed only where the court is satisfied that an actual controversy exists between competent parties who are before the court, and that the declaration sought will be a practical help in ending the controversy or in stabilizing disputed legal relations under the facts al-

leged and proved." Graham v. Beauchamp, 154 Neb. 889, 50 N. W. 2d 104.

Consistent with these authorities, the trial court declined to render a declaratory judgment on the questions presented by the cross-petition. In that it did not err.

The judgment of the trial court is affirmed in part, and in part reversed and remanded with directions to enter judgment in accord with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.