# CIRCUIT COURT OF HENRICO COUNTY

Rebecca Beard

v.

Michael Ragan

January 12, 2000

Case No. CL99-064

By Judge Catherine C. Hammond

The court, having carefully considered the evidence introduced at trial and the arguments of counsel, determines that judgment should be entered for the defendant. There follow the court's findings of fact and conclusions of law.

## The Trial

This case appeared initially to present a straightforward action to enforce two promissory notes made by the defendant, Michael Ragan, to the plaintiff, Rebecca Beard. In her case in chief, Beard proved that Ragan made two unsecured notes to Beard, one for $7,000.00 (PX1) dated April 16, 1998, and another for $18,500.00 (PX2) dated July 24, 1998, and that the entire debt of $25,500.00 (plus attorney's fees exceeding $4,000.00) was unpaid. However, the totality of the evidence showed that there was nothing straightforward about the formation of these contracts.

In February 1998, Ragan first met a man named Jerold Schmeer, who visited Ragan at his home in Charlottesville. On that occasion, Ragan confessed to having a sexual relationship with Schmeer's wife, Tamara, for more than a year. During the next several months, Schmeer delivered thousands of dollars in cash to Ragan.

Rebecca Beard is the promissee on the two notes, but the money represented by the notes was Schmeer's. Beard testified that she handed $3,500.00 of Schmeer's cash to Ragan in April 1998 in exchange for PX1, which Ragan drafted. Beard did not participate in or witness any other delivery of funds to Ragan, although she is also the promissee named in PX2. Beard testified that her only role in this affair was to collect money from Ragan and give it to Schmeer. For this service, she was not promised any compensation. She did it as a favor to Schmeer.

Schmeer testified that he delivered $3,500.00 in cash to Ragan in the early part of 1998. And he was present when Beard handed an additional $3,500.00 in cash to Ragan in April 1998. Schmeer testified that this $7,000.00 is represented by PX1 and that he loaned this money to Ragan because he was a needy student whose family was "tapped out." Schmeer denied any connection between the money and Ragan's testimony. Schmeer explained that he has made many personal loans to friends such as Ragan.

On June 17, 1998, Schmeer's attorney requested a subpoena for Ragan to testify at a deposition in the Schmeers' divorce proceedings in the Hanover Circuit Court. (DX1.) The deposition was properly noticed for July 28, 1998, (DX2) and Ragan admitted receiving service of process.

Near the same time, according to Schmeer, he delivered additional cash sums to Ragan, in the amounts of $2,500.00, $2,000.00, and $2,000.00, plus a check made to a Toyota car dealer in the amount of $11,990.00. Schmeer testified that PX2 represents these cash sums plus the check. He recalled Ragan's signing PX2 in a parking lot; then the men drove to Schmeer's office to see Schmeer's employee, Tracy Shell, who is a Notary Public. Shell testified that she notarized PX2 on July 24, 1998, in the parking lot outside Schmeer's office with Ragan present. Beard was not present.

Schmeer gave Ragan the check made payable to the car dealer on July 24, 1998, four days before he was under court order to appear and testify in the Schmeers' divorce case. At the same meeting, Schmeer also demanded that Ragan sign what the two men referred to as an "affidavit" stating various salacious facts, including that Ragan committed adultery with Tamara Schmeer. Schmeer testified at trial that he "would not have given the check to Ragan unless he signed the affidavit." On July 25, 1998, Ragan used the check to buy himself a car, in which Schmeer took no security interest. On July 28, 1998, Ragan ignored the Hanover Circuit Court's Order and failed to appear for his deposition.

Ragan's version was, of course, different from Schmeer's. Ragan testified that Schmeer wanted "to get the upper hand" in his divorce by having Ragan testify about his relationship with Tamara and that Schmeer initiated a

discussion connecting money and testimony. Ragan admitted receiving money from Schmeer ($6,500.00 in cash plus the $11,990.00 with which Ragan bought a car). But, Ragan testified, the men agreed that the notes would be destroyed if Ragan testified in the divorce as Jerold Schmeer's witness. At trial, Ragan stated his understanding. "If I gave the deposition, I'd get to keep the money." As to why he did not obey the subpoena, Ragan stated, "I didn't want to destroy Tamara's life by giving that kind of testimony." He quit "dating" Mrs. Schmeer in August 1998.

As is clear from this summary of the evidence, the credibility of the witnesses and their attitude and demeanor were matters of considerable importance. The court has accepted the testimony of two witnesses on November 23, 1999,[1] who established that Ragan's reputation for truthfulness is poor. But there was precious little veracity to be had throughout the trial.

*The Law*

Counsel for both parties presented oral argument on the question whether these two promissory notes, valid on their face, are enforceable given the evidence recounted above. Ragan argues that the contracts are void as against the public policy of the Commonwealth. Beard counters that the notes are regular notes and should be enforced, but that even if the evidence about paying a witness is believed, no law or policy forbids a contract to pay a witness to testify truthfully. Beard contends that Virginia's public policy on this subject is merely to forbid bribery of a witness, as provided in Virginia Code § 18.2-441.1.

The law is plain that an illegal contract, one with an unlawful object, is void and unenforceable as a matter of law, whether its unlawful object is forbidden by statute, by common law, or by public policy. *Colbert v. Ashland Const. Co.,* 176 Va. 500 (1940); *Massie v. Dudley,* 172 Va. 42 (1939); *American-LaFrance and Foamite Industries, Inc. v. Arlington County,* 164 Va. 1 (1935); *Levy v. Davis,* 115 Va. 814 (1914); *Roller v. Murray,* 112 Va. 780 (1911). If such a contract is *malum in se,* rather than simply invalid, this

---

[1] The testimony of one of these witnesses was admitted by stipulation of the parties. The stipulation was a solution to the problem caused when that witness, another resident of Charlottesville, failed to appear twice. He did not appear at trial on November 3, 1999, simply ignoring the subpoena served by the Sheriff of Albemarle County. This caused the court to continue the trial and to issue an order to show cause commanding his appearance on the November 23, 1999, continuance date. The witness again failed to appear on that date, resulting in a second order to show cause and a finding of contempt.

court cannot "render aid to relieve either party of the consequences of their acts but will leave them where it finds them." *American-LaFrance and Foamite Industries, Inc. v. Arlington County,* 169 Va. 1, 9 (1937). The Court has specifically stated that Virginia law does not recognize a breach of contract action for a promise to pay money in consideration of another's doing an immoral or illegal act. *Carr v. Gooch,* 1 Va. (1 Wash.) 260 (1794).

Where the Court has declared contracts void under this doctrine, the plaintiff has not been able to recover damages otherwise due him. *E.g. Levy v. Davis* (plaintiff cannot obtain payment for furniture he delivered to a "house of prostitution"); *Massie v. Dudley* (plaintiffs cannot recover under an express contract for a real estate commission where they were not licensed as brokers); *American-LaFrance* (plaintiffs cannot obtain payment for fire safety equipment they delivered to a municipal corporation that had no power to purchase the same). In discussing what contracts are against public policy, the Court borrowed this comment in *O'Dell v. Appalachian Hotel Corp.,* 153 Va. 283 (1929).

> [C]ourts of justice will never recognize or uphold any transaction which, in its object, operation, or tendency, is calculated to be prejudicial to the public welfare. That sound morality and civic honesty are corner stones of the social edifice is a truism which needs no reinforcement by argument. It may, therefore, be taken for granted that whenever the courts are called upon to scrutinize a contract which is clearly repugnant to sound morality and civic honesty, they need not look long for a well-fitting definition of public policy or hesitate in its practical application to the law of contracts.

153 Va. at 292 (citing *Veasey v. Allen,* 66 N.E. 103, 106 (N.Y. 1903)).

### The Case

The court finds as a fact that Schmeer's money went to Ragan in connection with testimony requested of him in the divorce proceeding. It would be very difficult for this court to infer reasonably from the evidence that Schmeer advanced $25,500.00 to his wife's lover, without taking any security or otherwise adopting regular incidents of lending, and used Beard as a go-between, all as a gesture of friendship. This court cannot reach such a conclusion given the undisputed testimony that these transactions coincided with the Schmeers' divorce proceeding; that Schmeer bought Ragan a car four

days before his deposition; and that Schmeer demanded the "affidavit" confessing misconduct before he gave Ragan the $11,990.00 check.

The first question to answer is whether, notwithstanding the connection between money and testimony, the notes are lawful because Schmeer only wanted Ragan to testify truthfully as to facts within his knowledge. The answer is no. The public policy of Virginia does not respect a contract to pay a fact witness in excess of reasonable amounts for his time and expenses.

In *Slayton v. Weinberger*, 213 Va. 690 (1973), a *habeas corpus* action, the Court considered a claim that payments to defense witnesses showed ineffective assistance of counsel. The defense witnesses, police officers, were paid $40.00 as reimbursement for their time and expense in attending court. Although this fact did not establish constitutional error to justify the writ, the Court observed that "[s]uch agreements [while not unusual] are not to be encouraged, and for that reason, they are not legally enforceable." 213 Va. at 694.

The public policy of the Commonwealth also is expressed in the statutes setting witness fees. Va. Code §§ 17.1-611 to 17.1-617. At common law, witnesses were not paid at all, attendance and testimony being considered an important duty of citizenship. *Blair v. United States*, 250 U.S. 273, 279 (1919). When the General Assembly provided for witness fees, its intent was to provide an orderly and uniform method for reimbursement so that fact witnesses would not be negotiating for money with the people having an interest in the outcome of the dispute. Likewise, the Commonwealth's policy on this subject can also be discerned in the Rules of the Virginia Supreme Court. Disciplinary Rule 7-108 forbids a lawyer from paying lay witnesses more than for expenses and lost time in attending or testifying. Ethical Consideration 7-25 states that witnesses "should be free from any financial inducements that might tempt them [to depart from the truth]."

Given these rich expressions of the Commonwealth's public policy, this court rejects plaintiff's contention that Virginia law would enforce a contract to pay a witness over $25,000.00 to do only what he is required when summoned by the court. Paying any witness on a negotiated basis is bad business, and the reason is not obscure. "[S]uch agreements hold out an inducement to commit fraud or procure persons to commit perjury." *Miller v. Anderson*, 196 N.W. 869, 871 (Wis. 1924).

American courts have repeatedly held that where a witness is or can be compelled to attend by way of subpoena, a promise to pay extra fees for his attendance is unenforceable. *State ex rel. Spillman v. First Bank of Nickerson*, 207 N.W. 674 (Neb. 1926); *Dodge v. Stiles*, 26 Conn. 463 (1857); *Pool v. Boston*, 5 Cush. 219, 221 (Mass. 1849); *Clifford v. Hughes*, 124 N.Y.S. 478

(App. Div. 1910); *Wright v. Somers*, 125 Ill. App. 256 (1906). To suggest that a witness' testimony is a matter of negotiation is to impugn society's reliance upon courts of law. It does not matter very much whether Schmeer expected Ragan to tell the truth or to lie. By handing thousands of dollars to a witness he called to testify, without any of the regularities that typically accompany loans of this size, and suggesting that Ragan even had the option *not* to testify, Schmeer rebuked the institution that he now comes before with his prayer for a money judgment against Ragan. The Supreme Court of Nebraska put it this way.

> It is not necessary for us to find that the intent of the contract was to procure perjury but that the contract had the tendency and opened a strong temptation to the procurement of perjury. The tendency of such arrangements is to pervert justice, to bring courts into disrepute, and to cause a lack of confidence therein. The maintenance of such confidence is fundamentally necessary to the promotion of our institutions, and to foster or permit such transactions is to undermine them. Such agreements would lead to the suspicion of each and every witness presented, thus demanding that each be interrogated as to what secret arrangements he had with attorneys or clients as to his compensation. To even ask which, under our present practice, would be to insult the witness and lay such attorney open to court censure, if not more severe punishment, so clean has been our court procedure and conception of duty. The suggestion of such a practice is objectionable and fraught with many dangers. Witnesses, like jurors and court officers, owe a duty to the state to aid in the due administration of government, for such compensation as the law provides. The least tendency to the contrary should not be tolerated, however innocent the claimed intent.

*First Bank of Nickerson*, 207 N.W. at 676.

In sum, this court finds from the evidence that the notes signed by Ragan are void and unenforceable because they violate the public policy of the Commonwealth. The court need not reach the second question, whether Schmeer's actions were intended to procure false testimony. However, it seems probable that they were.