LARRY W. MYERS, FOR HIMSELF AND ALL OTHER PERSONS
SIMILARLY SITUATED, APPELLANT, V. NEBRASKA INVESTMENT
COUNCIL, AN AGENCY OF THE STATE OF NEBRASKA,
ET AL., APPELLEES.
724 N.W.2d 776

Filed December 8, 2006.    No. S-05-532.

H. Daniel Smith and David J. Koukol, of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, L.L.P., and J. Patrick Green, of Creighton University School of Law, for appellant.

Jon Bruning, Attorney General, and Dale A. Comer, and Tim Engler and Christopher R. Heinrich, of Harding, Shultz & Downs, Special Assistant Attorneys General, for appellees Nebraska Investment Council et al.

Shawn Renner, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., and Earl H. Nemser and David S. Hoffner, of Dechert, L.L.P., for appellees WG Trading Company, L.P., and Westridge Capital Management, Inc.

CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ., and CARLSON and MOORE, Judges, and HANNON, Judge, Retired.

CONNOLLY, J.

Larry W. Myers appeals from a district court order dismissing a class action he filed on behalf of himself and other taxpayers to recover an alleged illegal expenditure of state funds. Myers sought an order declaring illegal, ultra vires, and void two contracts entered into between the Nebraska Investment Council (NIC) and private entities, WG Trading Company Limited Partnership (WG Trading) and Westridge Capital Management, Inc. (Westridge). Myers alleged that the State had lost $40 million or more in public retirement funds because the contracts were speculative and illegal and were statutorily and constitutionally prohibited investments. The investment of these funds was governed by the Nebraska State Funds Investment Act, Neb. Rev. Stat. §§ 72-1237 through 72-1260 (Reissue 1996 & Cum. Supp. 2000).

Myers asked for the following relief from Westridge and WG Trading: (1) a repayment to the State of all losses, (2) a disgorgement of all fees received or denied under the contracts, and (3) an equitable accounting of all transactions occurring under the contracts. From the NIC officials, Myers sought a money judgment for the funds transferred to Westridge and WG Trading and the amount necessary to reimburse the retirement funds for all losses suffered by the State because of the investment contracts.

## I. MYERS' PLEADINGS AND BACKGROUND

We glean the following from Myers' operative complaint and attachments and evidence submitted at a hearing to determine whether the case was moot. On April 24, 2001, the NIC members voted to invest 10 percent of the domestic equity assets from the State's defined-benefit retirement plans in an "enhanced index strategy" managed by Westridge. According to the report prepared by the NIC's counsel, this amount represented about 5 percent of the State's approximate $4.5 billion in defined-benefit retirement funds.

In June 2001, the investment officer, Rex W. Holsapple, signed a contract on behalf of NIC with Westridge for investment management services. In the contract, Westridge offered services for an enhanced index strategy, as measured against the

total return of Standard & Poor's 500 total return index. The strategy consisted of (1) "a separately managed account that invests in securities, futures and options," for which account Westridge served as the investment manager, and (2) an investment in Westridge's affiliated partnership, WG Trading. WG Trading is a Delaware limited partnership that invests in an "index arbitrage strategy." The managing general partners of WG Trading are Paul R. Greenwood and Stephen Walsh.

In the Westridge contract, the NIC granted Westridge broad discretion to invest and reinvest the State's assets in the managed account, and the contract required 80 percent of the State's assets to be invested in WG Trading. Also in the contract, the NIC acknowledged that WG Trading could have conflicting loyalties between the NIC and Westridge and that its fee schedule created an incentive for Westridge "to make investments that are riskier or more speculative than would be the case in the absence thereof." The parties could terminate the Westridge contract upon 30 days' notice, but the NIC's withdrawal from the WG Trading contract was not governed by the Westridge contract.

On June 14, 2001, the NIC executed a subscription contract to purchase limited partnership interests in WG Trading for $200 million. See Black's Law Dictionary 1427 (6th ed. 1990) (defining subscription contract as "any contract by which one becomes bound to buy"). Around June 27, the NIC transferred $200 million to Westridge or WG Trading, with $160 million invested with WG Trading and $40 million invested with Westridge. The NIC later transferred an additional $35 million to Westridge and WG Trading.

The WG Trading partnership contract provided: "The purposes of the Partnership are (i) to buy, sell, sell short, lend, borrow, hold, trade, invest, deal in and otherwise exercise all rights, powers, privileges and other incidents of ownership in Securities, Options, commodities, futures and any and all other types of investments . . . ." The partnership contract authorized WG Trading to engage in any transaction necessary to accomplish this purpose, "including, without limitation, borrowing money, engaging in margin or short sale transactions, repurchase transactions and reverse repurchase transactions."

Paragraph 17.1 of the contract provided:

> The Limited Partners acknowledge that the Partnership has been organized to invest primarily in arbitrage and other hedged strategies but that this type of investing is speculative and may involve a high degree of risk, including both market and credit risks. . . . Moreover, the Limited Partners acknowledge that allocation of Net Profits to the General Partners may create an incentive for the Managing General Partners to make investments that are riskier or more speculative than would be the case in the absence thereof . . . .

After entering into this contract, Holsapple requested from the Nebraska Attorney General an opinion that the NIC had authority to enter into the WG Trading partnership contract. The Attorney General responded by letter that the NIC and Holsapple had exceeded their authority by entering into the limited partnership. He opined that the contract violated § 72-1247, which expressly prohibited "purchasing securities or investments on margin and the buying of call and put options." In addition, the Attorney General concluded that the investment violated the "prudent man standard" of § 72-1247, which required the funds to be managed "not for speculation but for investment." The Attorney General concluded that the State was not bound by the contract and that the NIC should take immediate steps to secure the retirement funds.

Holsapple later sought to address the Attorney General's concerns about the investments and submitted a report to the Attorney General. The Attorney General repeated, by letter, its earlier conclusions that the partnership contract violated § 72-1247. The Attorney General agreed, however, to allow the NIC to obtain an opinion from outside legal counsel.

The law firm retained by the NIC, Kutak Rock, issued a report to Holsapple in January 2002. The firm acknowledged that § 72-1247 prohibited the NIC from directly making the investments that the contract authorized WG Trading to make. It concluded, however, that this circumstance was similar to many investments that are made in entities "engaging in conduct in which the investor could not engage directly. For example, the [NIC] certainly could not operate a software company, but no one would question an investment by the [NIC] in Microsoft

[Corporation]." Based on this reasoning, Kutak Rock framed the issue as whether WG Trading was acting as an agent or alter ego for the NIC. The firm concluded that the NIC's investment in WG Trading did not violate § 72-1247 because the NIC could not direct WG Trading to make investments, prohibited or otherwise.

Kutak Rock further concluded that the prudent investor standard of § 72-1247, prohibiting speculation, was ambiguous on its face. It asserted that any investment in equity securities was speculative and that options and futures could be methods to decrease overall risk, i.e., hedging. Citing commentary in the Restatement (Third) of Trusts, ch. 7, topic 5 (1992), the firm concluded that specific investments should not be judged in isolation but on the roles they play in overall portfolio strategies.

In January 2002, the Attorney General sent a letter to the chair of the Legislature's executive board, explaining the investment contracts and disagreeing with Kutak Rock's conclusions. The Attorney General acknowledged that the NIC was not required to transfer additional funds to WG Trading for margin calls because the investment was through a limited partnership, but he argued that the State's assets could still be lost if the underlying securities decreased 50 percent in value.

Also, in January 2002, Holsapple's tenure as the investment officer ended. In April, the Legislature repealed § 72-1247. In August, the NIC appointed Carol L. Kontor, who had been an NIC member, as the new investment officer.

### 1. Myers' Complaint

In April 2003, Myers filed this class action against (1) the NIC, (2) the five NIC voting members, (3) Holsapple, (4) WG Trading, and (5) Jane Doe and John Doe, representing other unknown business entities that may have entered into partnership agreements or investment contracts with the State. In June, the NIC, Holsapple, the NIC members, and WG Trading moved to dismiss because the court lacked personal and subject matter jurisdiction and Myers' pleading failed to state a cause of action.

In December 2003, Myers filed his operative complaint and included Westridge as a defendant. Myers alleged that he had made demand on the Attorney General to bring this action and

that the Attorney General had declined. In Myers' first four claims, he alleged the following: (1) The NIC officials breached their statutory duties; (2) the NIC officials breached their fiduciary duties to act in the best interests of the equitable beneficiaries of the retirement funds; (3) Westridge, WG Trading, Walsh, and Greenwood breached their fiduciary duty to the State to disclose that the investment contracts with the State were illegal and to refrain from investing the State's assets until they had obtained authorization from the Attorney General; and (4) the acts of the defendants constituted constructive fraud by injuring the public's interests.

In his fifth claim, Myers asked the court to declare the Westridge and WG Trading contracts void ab initio because they were "*ultra vires*, contrary to public policy, procured through constructive fraud and breach of fiduciary duties, contrary to statute, and prohibited by the Constitution of the State of Nebraska." He also requested the court to declare that §§ 72-1237 and 72-1239.01 were unconstitutional to the extent they purported to "exculpate, exonerate or immunize" NIC members from personal liability for breaches of their fiduciary or statutory duties.

In his sixth claim, Myers sought a rescission of the contracts for the same reasons stated in his fifth claim. In his seventh claim, Myers requested an accounting and order returning all state moneys with interest that had come into the possession of Westridge, WG Trading, Walsh, or Greenwood. In the eighth claim, Myers alleged that the WG Trading contract was ultra vires and void for the additional reason that it constituted the giving or loaning of the State's credit to WG Trading, in violation of Neb. Const. art. XIII, § 3 ("credit of the state shall never be given or loaned in aid of any individual, association, or corporation").

In his ninth claim, Myers requested the court to declare the contracts void as an impermissible delegation of the State's legislative and police powers, vested in the NIC, to private individuals and entities. In his 10th claim, he requested restitution and alleged that in addition to the original $200 million the NIC transferred to Westridge, the NIC also transferred $15 million, $1.75 million, and amounts not yet determined for capital calls

under the illegal contract with WG Trading. In his final claim, Myers alleged that if the court did not declare the contracts void, Westridge had breached the contract because Westridge knew or should have known that the NIC could not lawfully expend public funds on the WG Trading partnership.

Myers prayed for a judgment against the NIC members individually for the full amount necessary to reimburse the retirement funds, plus interest. He also requested an order requiring WG Trading to disgorge all fees and pay all funds lost plus interest from the illegal contracts. In addition to his declaratory judgment request in the fifth claim, Myers also requested that the court declare in the eighth and ninth claims that (1) the contracts were void ab initio and (2) §§ 72-1237 and 72-1239.01 were unconstitutional to the extent they protected the NIC officials from individual liability.

By February 9, 2004, all the defendants had moved to dismiss. On February 23, the NIC terminated the contracts with Westridge and WG Trading.

## 2. DISTRICT COURT'S ORDER

In July 2004, the district court entered an order concluding that Myers had standing as a taxpayer on the first 10 claims. The court also found that Myers lacked standing to pursue his breach of contract claim against Westridge.

Regarding the claims against the NIC members and Holsapple, the court concluded that Myers was "seeking to compel an affirmative action by said defendants (that they pay money to the state)." Thus, the court concluded that sovereign immunity protected the NIC members and Holsapple from claims seeking monetary damages. The court further determined that Myers' operative complaint failed to state a cause of action against Westridge, WG Trading, Walsh, or Greenwood. The court held that these defendants were investors for the NIC and Holsapple, but "not advisors concerning the validity or appropriateness of any investment by the NIC and Holsapple of state funds into the Westridge Agreement and the WG Trading Agreement." The court concluded the defendants had no duty to independently verify Holsapple's representations that the NIC had authority to enter into the investment contracts. Thus, the court dismissed every claim except the claims that the contracts

were void ab initio and that the contracts and the two statutes were unconstitutional.

In August 2004, the NIC and Holsapple filed their answer. They alleged as affirmative defenses, among other things, that Myers lacked standing and that the causes of action were moot or barred by laches and sovereign immunity. On September 3, $246,251,319.75 was returned to the NIC. Several days later, the NIC members and Holsapple moved for partial summary judgment on the remaining declaratory judgment issues in the operative complaint. The court, however, never conducted a hearing on this motion.

In October 2004, the NIC and Holsapple filed a suggestion of mootness. At the hearing, the court questioned the need for voiding the contracts and whether a justiciable issue remained when the contracts no longer existed.

In March 2005, the court issued a written order in which it found that the NIC had invested a total of $235 million and that WG Trading had returned to the NIC $246,251,319.75, the total principal plus interest. We note, however, that according to Kontor's affidavit, the amount returned actually equaled "principal and income." Thus, the court determined that declaratory relief was moot. It further determined that the public interest exception did not apply because the Legislature had repealed § 72-1247.

This court granted Myers' petition to bypass the Nebraska Court of Appeals.

## II. ASSIGNMENTS OF ERROR

Myers assigns that the district court erred in (1) granting the defendants' motions to dismiss, (2) sustaining the State's suggestion of mootness, (3) failing to declare the NIC contracts unlawful and void, (4) failing to declare the contracts unconscionable and void, (5) dismissing individual NIC members and Holsapple from the case, (6) dismissing Westridge and WG Trading, (7) holding that claims against Holsapple and the NIC members were barred by sovereign immunity, (8) holding that Myers did not have standing to pursue a breach of contract claim against Westridge, and (9) concluding that the case was moot after the contracts were canceled.

### III. STANDARD OF REVIEW

An appellate court reviews de novo a lower court's dismissal of a complaint for failure to state a claim. *Johnston v. Nebraska Dept. of Corr. Servs.*, 270 Neb. 987, 709 N.W.2d 321 (2006). When analyzing a lower court's dismissal of a complaint for failure to state a claim, an appellate court accepts the complaint's factual allegations as true and construes them in the light most favorable to the plaintiff. *Id.* A court will not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief. *Id.*

An appellate court determines a jurisdictional question that does not involve a factual dispute as a matter of law. See *New Tek Mfg. v. Beehner*, 270 Neb. 264, 702 N.W.2d 336 (2005).

### IV. ANALYSIS

#### 1. STANDING

The State raises two initial jurisdictional issues. It contends that Myers lacks taxpayer standing and that Myers lost taxpayer standing even if he initially had standing. Before reaching the legal issues presented for review, it is the duty of an appellate court to settle jurisdictional issues. *Gabel v. Polk Cty. Bd. of Comrs.*, 269 Neb. 714, 695 N.W.2d 433 (2005).

#### (a) Taxpayer Standing

The State argues that Myers does not qualify for the taxpayer exception to traditional standing requirements. Standing is the legal or equitable right, title, or interest in the subject matter of the controversy, which entitles a party to invoke the jurisdiction of the court. *Adam v. City of Hastings*, 267 Neb. 641, 676 N.W.2d 710 (2004).

Standing is fundamental to a court's exercise of jurisdiction, and either a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding. *Smith v. City of Papillion*, 270 Neb. 607, 705 N.W.2d 584 (2005). Standing is a jurisdictional component of a party's case because only a party who has standing may invoke the jurisdiction of a court. *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002). As an aspect of jurisdiction and justiciability, standing requires that a litigant have a personal stake in

the outcome of a controversy: a personal stake that would warrant invocation of a court's jurisdiction and justify the exercise of the court's remedial powers on the litigant's behalf. *Id.*

Taxpayer litigants have an equitable interest in public funds and can maintain an action to prevent their unauthorized appropriation. See *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004). Usually, a person seeking to restrain the act of a public board or officer must show special injury peculiar to himself or herself aside from and independent of the general injury to the public. *Id.* But a resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes. *Id.* Here, Myers has alleged an illegal expenditure of public funds.

The State, however, contends that "there never existed an 'expenditure' of public funds" because "[a]n 'investment' is not an 'expenditure.'" Brief for appellee at 17. The State argues that an investor anticipates it may redeem its investment at any time as the parties agree, whereas an expenditure involves a permanent exchange of funds for goods or services. This argument misses the point. Both Westridge and WG Trading charged base management fees for their services, regardless of whether their investments were profitable. The fee schedule provided Westridge with a base fee of .0625 percent quarterly, in addition to its incentive fees. Under the WG Trading partnership contract, the managing partners were entitled to a .25-percent quarterly fee, in addition to their priority status for 20 percent of the partnership's net profits. The WG Trading contract also provided that the State give 6 months' notice to withdraw its capital contributions and terminate the contract. Thus, upon execution, the WG Trading contract required the State to make "permanent" expenditures for investment management services for two quarterly periods.

The State also argues the contracts did not violate § 72-1247. Attempting to create a legal figleaf, the State repeats the argument made by Kutak Rock in its report to Holsapple. That is, the contracts were permissible because, by analogy, the State could legally invest in Ford Motor Company, even though the company might use those funds to buy call and put options or

buy securities on margin, investment transactions prohibited by § 72-1247.

The State confuses service contracts with security investments. The WG Trading contract specifically provides that buying options was one of the partnership's purposes. In addition, the contract authorized WG Trading to engage in margin or short sale transactions. A governmental entity may not accomplish indirectly what it is prohibited from doing directly, whether prohibited by constitutional or statutory provisions. See, e.g., *Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836 (1991).

Because Myers alleged that § 72-1247 prohibited the investment officer from investing state assets in specified transactions, he alleged facts sufficient to survive a motion to dismiss. The district court did not err in concluding that Myers had standing as a taxpayer to bring an action to challenge the illegal expenditure of public funds.

(b) Continuing Standing

The State argues that even if Myers initially qualified for the taxpayer exception, he no longer has standing because the alleged illegal expenditure has been returned to the State. The State contends that WG Trading's return of the State's assets "also removes Myers' standing" because "standing must be maintained throughout the course of litigation for a court to maintain jurisdiction." Brief for appellee at 13-14.

It is true that the "personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." See *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980) (quoted in *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989)). Further, the U.S. Supreme Court has held that a plaintiff bears the burden of establishing standing and that a defendant may "point out a *preexisting* standing defect late in the day." (Emphasis supplied.) *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.4, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Yet, in the same case, the Court stated that jurisdiction, including standing, "is to be assessed under the facts existing when the complaint is filed." *Id.* The timing requirement is important because the plaintiff's personal interest "is to be assessed under the rubric of standing at

the commencement of the case, and under the rubric of mootness thereafter." *Becker v. Federal Election Com'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000).

The State cites only one decision in which a court held that a plaintiff can lose its standing during a lawsuit. See *Powder River Basin Resource Council v. Babbitt*, 54 F.3d 1477 (10th Cir. 1995). In a more recent case, however, the 10th Circuit held that "[s]tanding is determined as of the time the action is brought." *Nova Health Systems v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005). In a footnote, the court specifically addressed its earlier holding:

> In *Powder River Basin Res. Council v. Babbitt*, we stated that a plaintiff had "lost standing" in the middle of a lawsuit. . . . Although we used standing terminology, it seems that this was really a mootness question. Other courts have criticized *Powder River* for using standing terminology for what was really a mootness issue. See *Becker v. FEC*, 230 F.3d 381, 386 n. 3 (1st Cir.2000).

*Nova Health Systems v. Gandy*, 416 F.3d at 1155 n.5. We reject the State's argument that Myers lost standing.

## 2. MOOTNESS

Myers argues that because he is entitled to equitable remedies against the NIC officials, Westridge, and WG Trading, the district court erred in determining that the case was moot. Both standing and mootness are key functions in determining whether a justiciable controversy exists, or whether a litigant has a sufficient interest in a case to warrant declaratory relief. *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989). To obtain declaratory relief, a plaintiff has the burden to prove the existence of a justiciable controversy and an interest in the subject matter of the action. *Id.* And a declaratory judgment action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action. *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004).

Also, a party cannot seek a declaratory judgment which is merely advisory. *Id.* But a suit seeking damages for harm caused by past practices is not rendered moot by the cessation of the challenged conduct. *Id.*

Here, the parties have terminated the contracts, and the principal and income have been returned to the State. But Myers sought a money judgment against Holsapple and the NIC members that was greater than the moneys returned to the State. If Myers was entitled to recover the additional relief he requested, then the case is not moot. However, whether he is entitled to additional relief depends upon whether sovereign immunity bars his requested relief and whether he is barred as a taxpayer to recover on behalf of the State.

## (a) Sovereign Immunity

The State contends that Myers' prayer for monetary damages would have required affirmative "acts" from the NIC defendants, which are barred by sovereign immunity. Thus, the State contends that the district court properly dismissed those claims. Myers, however, contends that sovereign immunity does not apply because his claim is not against the State but against public officials who abused their authority or committed ultra vires acts.

When a party brings an action against an individual employee of a state agency, a court must determine whether the action against the individual official is in reality an action against the state and therefore barred by sovereign immunity. *State ex rel. Steinke v. Lautenbaugh*, 263 Neb. 652, 642 N.W.2d 132 (2002). Sovereign immunity bars suits which seek to compel state officials to take affirmative action. *Martin v. Nebraska Dept. of Corr. Servs.*, 267 Neb. 33, 671 N.W.2d 613 (2003). But sovereign immunity does not bar an action against a public officer to obtain relief from an invalid act or from an abuse of authority by the officer or agent. *Martin v. Nebraska Dept. of Corr. Servs., supra.* The exception to sovereign immunity applies because a court regards a state officer's illegal or unauthorized acts as their own acts and not acts of the state. See *State ex rel. Steinke v. Lautenbaugh, supra.*

Construing Myers' allegations in the light most favorable to him, sovereign immunity does not bar his claims against the NIC officials. The question still remains, however, whether Myers has alleged facts that show that he has an equitable right to recover on behalf of the State.

## (b) Taxpayer's Equitable Right to Recover Illegal Expenditures

Myers contends that the investment contracts were void when made because the WG Trading partnership contract violated the prohibition in § 72-1247 against buying options, buying on margin, and engaging in speculative investments. He argues that because the contracts were void, he has an equitable right to recover on the contracts.

This court first discussed a taxpayer's equitable rights to recover from public officials almost 100 years ago in *Cathers v. Moores*, 78 Neb. 17, 113 N.W. 119 (1907). The *Cathers* court held that a resident taxpayer of a municipal corporation has an equitable right to "maintain an action against its officers who have squandered or dissipated its funds, or paid them out for an unlawful or unauthorized purpose, *to recover such funds . . .* where its proper law officer neglects and refuses to prosecute such an action." 78 Neb. at 18-19, 113 N.W. at 120. But the *Cathers* court also held that "before a taxpayer can maintain an equitable action to recover money expended by the officers of a [governmental entity], it must appear that the city itself could have maintained such action in the first instance." *Id.* at 23, 113 N.W. at 122.

In *Cathers*, the Legislature had passed an act creating a new charter for the city of Omaha, which mandated that specified employees would not receive compensation before the mayor and city council had fixed their compensation. The city failed to comply with this charter provision, and a taxpayer brought an action to force city officials to refund the payroll funds paid under void transactions. The taxpayer's right to recover on behalf of the city hinged on the distinction between a contract that is void ab initio and a contract that is unenforceable. See, Restatement (Second) of Contracts § 8 (1981); 1 Samuel Williston, A Treatise on the Law of Contracts § 1:21 at 51 (Richard A. Lord ed., 4th ed. 1990) ("there is a class of agreements which, though not enforceable by ordinary legal remedies, may nevertheless produce certain legal consequences for the parties to them"). In discussing this difference, the court in *Cathers* stated:

"There is a clear distinction between contracts outside of the powers conferred upon municipal corporations and contracts within the general scope of the powers conferred, but which have been irregularly exercised. Contracts falling entirely outside of powers delegated to the corporation are absolutely null and void, and no right of action against the corporation can be founded upon them. The rule with reference to the liability of the corporation on contracts within the general scope of the powers granted, but which have been irregularly exercised, is well stated in 2 Dillon, Municipal Corporations (4th ed.), sec. 936, as follows: 'A municipal corporation, as against persons who have acted in good faith and parted with value for its benefit, cannot . . . set up mere irregularities in the exercise of the power conferred, as, for example, its failure to make publication in all of the required newspapers of a resolution involving the expenditure of moneys.' "

The action of the [defendant officials] was not *ultra vires* in the proper sense of that term, and we are of [the] opinion that the city would be estopped to set up the irregularities complained of as a defense to an action brought against it by the employees to recover the value of their services.

*Cathers v. Moores*, 78 Neb. 17, 21-22, 113 N.W. 119, 121 (1907), quoting *Rogers v. City of Omaha*, 76 Neb. 187, 107 N.W. 214 (1906) (holding that city was liable in quantum meruit for value of contractor's street grading despite city's failure to comply with statute requiring it to obtain consent from landowners and make damage assessments before grading streets).

In *Cathers*, this court stated that the city unquestionably had the power to contract for the services at issue even if "it may be said that its authority was so irregularly exercised as to render the proceedings illegal." 78 Neb. at 21, 113 N.W. at 121. We further stated that the city had received the benefit of the employees' services and that the trial court had found that none of the defendant city officials had interests in the contracts. Thus, we held that a taxpayer could not recover from the city because the city would be estopped from relying upon the alleged statutory violation as a defense in an action to recover the value of the services rendered.

This court reached the same conclusion in *Scheschy v. Binkley*, 124 Neb. 87, 245 N.W. 267 (1932), a taxpayer action against a school district's treasurers and officers. The taxpayer alleged that the officers had violated a statute providing that " '[n]o school officer shall be a party to any school contract for building or furnishing supplies, except in his official capacity as a member of the board.' " *Id.* at 90, 245 N.W. at 268. The officers had paid school board members for services and materials for constructing temporary buildings before the brick schoolhouse was constructed. This court concluded that a taxpayer could not recover against the officers except for fraud or unreasonable charges. *Id.* We reasoned that it would be unconscionable to permit the school district to retain the benefits and allow it to avoid payment.

Thus, even though the officers violated a statute that limited its power to make contracts between the school district and its officers, the taxpayer could not recover funds expended in violation of the limiting statute.

These cases illustrate that a taxpayer has no equitable right to recover funds from public officers merely because they violated a statute. The cases cited by Myers are distinguishable. It is true that if a statute explicitly prohibits a governmental entity from entering into a contract and avoids the obligation made in violation of the statute, then the contract is void ab initio and funds paid out under the contract may be recovered in suit by the governmental entity or by a taxpayer suing on its behalf. See, *Arthur v. Trindel*, 168 Neb. 429, 96 N.W.2d 208 (1959); *Heese v. Wenke*, 161 Neb. 311, 73 N.W.2d 223 (1955); *Neisius v. Henry*, 142 Neb. 29, 5 N.W.2d 291 (1942); *Village of Bellevue v. Sterba*, 140 Neb. 744, 1 N.W.2d 820 (1942). Similarly, when a governmental entity is wholly without statutory authority to make a contract, the contract is void ab initio and a taxpayer may recover funds paid out under the public contract: "In a situation . . . where the action is ultra vires and no power exists to act in the premises at all no liability may be imposed upon the statutory creature." *Fulk v. School District*, 155 Neb. 630, 643, 53 N.W.2d 56, 63 (1952).

Thus, our case law shows that a taxpayer can only recover on behalf of a governmental entity if the public contract is

void ab initio such that the party providing services or materials could not recover the value of those services in a quantum meruit action. See, *Scheschy v. Binkley, supra*; *Fulk v. School District, supra.*

The difference between a contract that is unenforceable against the State and a contract that is void ab initio is also present in nontaxpayer actions against the State brought by contracting parties to recover for goods or services. For example, in *Capital Bridge Co. v. County of Saunders*, 164 Neb. 304, 83 N.W.2d 18 (1957), we held that a seller of lumber could recover from a county when the county had authority to purchase lumber for a bridge, despite the county's failure to comply with a statute requiring the purchase to be made from the lowest bidder. We stated:

> [I]n the present case the statute does not avoid the obligation of a contract made in a manner contrary to the provisions of the statute. In such a situation the rule in this state is: Where a contract has been entered into in good faith by a [governmental entity], which contract was within the power of the [governmental entity] to make but was void for failure to comply with statutory requirements, an action in quantum meruit for the service performed or the material furnished may be maintained.

*Id.* at 310, 83 N.W.2d at 22-23.

Myers argues that the investment contracts are void ab initio and that the State is entitled to equitable relief because (1) the contracts violated § 72-1247, (2) the contracts constituted an impermissible delegation of the NIC's duties, (3) Westridge breached its implied fiduciary duty under the contracts to ensure that the State made only legal investments, and (4) the contracts were unconscionable.

### (i) Violation of § 72-1247

At the time of this action, § 72-1247 provided that "[t]he state investment officer *shall not buy on margin, buy call options, or buy put options.*" The statute limits investment transactions, even if it did not specifically prohibit a contract to have an agent engage in these transactions. Thus, as in *Scheschy v. Binkley*, 124 Neb. 87, 245 N.W. 267 (1932), the contracts are unenforceable.

The NIC nonetheless had general powers to contract for investment management services.

Section 72-1249.02 establishes the "State Investment Officer's Cash Fund" and requires each managed retirement fund to pay a pro rata share into the fund for an "investment management expense." Section 72-1249.02 explicitly provides:

> *Management*, custodial, and service costs which are a direct expense of state trust funds may be paid from the income of such trust funds [and these] costs shall include, but not be limited to . . . investment counsel fees for managing assets . . . . All such fees shall be approved by the [NIC] and the state investment officer.

(Emphasis supplied.) This section authorizes the investment officer to enter into contracts for investment management services.

According to a report by the NIC's outside counsel, the NIC is responsible for overseeing the investments of about $7.5 billion in state funds. It would be a Herculean task for the NIC officers to manage and invest these assets without the ability to contract for investment management services.

In sum, the NIC has the general power to contract for investment management services. We conclude that the NIC's violation of § 72-1247 would not avoid the State's obligation under the contract to pay for services received from Westridge or WG Trading. Although the contracts were unenforceable, they were not void ab initio because they violated § 72-1247. Thus, Myers cannot recover from the NIC officers on this ground.

### (ii) Impermissible Delegation of Authority

Myers contends that "[t]he Nebraska State Funds Investment Act does *not* provide for delegation of *any* of the duties imposed on the NIC and the Investment Officer." Brief for appellant at 18. He first argues that the express authorization in § 72-1242 for the investment officer to retain "financial advisors" operates to exclude a more extensive delegation of investment decisions. He apparently argues the investment officer has no authority to retain investment management services. As noted, however, § 72-1249.02 explicitly provides: "*Management*, custodial, and service costs which are a direct expense of state trust funds may be paid from the income of such trust funds . . . ." We find no

merit to his argument that § 72-1242 prohibited the NIC from contracting for investment management services.

Second, Myers contends that the WG Trading contract, with a term of 49 years, constituted "a total abdication of power and control by the NIC" regarding the money it invested in Westridge and WG Trading. Brief for appellant at 16-17. But he does not direct us to, nor has our research uncovered, any case law holding that a governmental entity charged by the Legislature with the investment of state funds may not contract for any investment services.

▉ The Nebraska Constitution does not prohibit the State from doing business or contracting with private institutions in fulfilling a governmental duty and furthering a public purpose. *Father Flanagan's Boys Home v. Dept. of Soc. Servs.*, 255 Neb. 303, 583 N.W.2d 774 (1998). Compare *State ex rel. Douglas v. Thone*, 204 Neb. 836, 286 N.W.2d 249 (1979).

In *Father Flanagan's Boys Home*, the statute at issue obligated the State to pay the cost of educating state wards under defined circumstances. The Nebraska Department of Health and Human Services argued that the statute violated Nebraska's constitutional prohibition against public appropriations to private schools. This court stated that the case did "not involve a contractual delegation of the state's duty to provide a free public education to its citizens. Rather, it involves a contract made by a state agency to obtain educational services for state wards for whom it is responsible in a quasi-parental capacity." *Id.* at 315, 583 N.W.2d at 782.

▉ Similarly, regarding municipal corporations acting as state agents, this court has adopted the following rule, which is equally applicable to other governmental entities acting as state agents: " '*Unless authorized by statute or charter*, a [governmental entity], in its public character as an agent of the state, cannot surrender, by contract or otherwise, any of its legislative and governmental functions and powers . . . .' " (Emphasis in original.) *Vap v. City of McCook*, 178 Neb. 844, 850, 136 N.W.2d 220, 224-25 (1965), quoting 2 Eugene McQuillin, The Law of Municipal Corporations § 10.38 (3d ed. 1966).

In *Vap*, this court rejected the argument by resident taxpayers that the city had "bartered away its police power to regulate

parking in the future." 178 Neb. at 849, 136 N.W.2d at 224. There, the city contracted with the State Department of Roads to prohibit parking on a street, in connection with improvements planned for U.S. highways passing through the city. We concluded that unlike some of our earlier cases, the Legislature had authorized the contracts between political subdivisions and the Department of Roads for a broad array of purposes. We reversed the district court's judgment that the contract was illegal and void. *Id.*

█ As in *Father Flanagan's Boys Home* and *Vap*, the Legislature has expressly granted power to the NIC to contract for investment management services. When a government entity is responsible for providing a service and has the power or legislative authority to contract for those services, its determination to enter into a contract for those services is a legislative act. See *Tracy v. City of Deshler*, 253 Neb. 170, 568 N.W.2d 903 (1997). See, also, *Winter v. Lower Elkhorn Nat. Resources Dist.*, 206 Neb. 70, 291 N.W.2d 245 (1980).

It is true that the NIC officials could not delegate their duty to formulate and establish policies for the investment of state funds as set out in § 72-1239. Similarly, the investment officer could not delegate his duty to direct investments and reinvestments of state funds. See § 72-1243. But if the Legislature had intended the investment officer or NIC officials to individually conduct every investment transaction involving state assets, it would not have authorized the investment officer to contract for investment management services.

Even if the investment management contracts involve the relinquishment of some discretionary decisionmaking on a day-to-day basis, the contracts are not prohibited when expressly authorized by statute. Although the term of the partnership contract with WG Trading ended on December 31, 2050, the NIC could withdraw its capital investment with 6 months' notice. And the record shows that the NIC did withdraw its capital when it voted to terminate the contracts in February 2004 and its principal and income moneys were returned in September 2004.

We conclude Myers' claim that the NIC totally abdicated its investment responsibilities by contracting to have part of those

assets managed by a private business is without merit. Thus, Myers' claim that the contracts constituted an impermissible delegation of duties did not entitle him to recover any relief on behalf of the State.

### (iii) Unconscionable Contracts

Myers contends that the contracts were unconscionable because the fees were excessive on their face and the contracts do not meet the "prudent investor" standard of § 72-1239.01. Brief for appellant at 27. Myers cites no authority to support his contention that the fees were excessive. Relying on *Custer Public Power Dist. v. Loup River Public Power Dist.*, 162 Neb. 300, 75 N.W.2d 619 (1956), Myers also argues that the contracts were unconscionable and void as against public policy.

In *Custer Public Power District*, the district contracted to buy substantially all of its electricity from a power system for 26 years instead of generating its own electricity. We held the contract was void as injurious to public welfare. We, however, did not hold the contract was unconscionable.

" 'The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt.' " *Id.* at 316, 75 N.W.2d at 629-30. It is the Legislature's function through the enactment of statutes to declare what is the law and public policy. *Clemens v. Harvey*, 247 Neb. 77, 525 N.W.2d 185 (1994). Unlike the utility contract in *Custer Public Power District*, this contract involved only a portion of the NIC's investment duties. Because the Legislature has authorized the NIC to contract for investment management services, the contracts did not violate public policy.

The unconscionability of a contract provision presents a question of law. See *Melcher v. Boesch Motor Co.*, 188 Neb. 522, 198 N.W.2d 57 (1972). When considering whether an agreement is unconscionable, this court has stated that the term "unconscionable" means manifestly unfair or inequitable. See *Weber v. Weber*, 200 Neb. 659, 265 N.W.2d 436 (1978).

A contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract. *Adams v. American*

*Cyanamid Co.*, 1 Neb. App. 337, 498 N.W.2d 577 (1992). In a commercial setting, however, substantive unconscionability alone is usually insufficient to void a contract or clause. See *id.*, citing 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28 (2d ed. 1990). A court must also consider whether the contract formation was procedurally unconscionable. See *id.*

An essential fact in determining unconscionability is the disparity in respective bargaining positions of parties to a contract. See *Ray Tucker & Sons v. GTE Directories Sales Corp.*, 253 Neb. 458, 571 N.W.2d 64 (1997).

In *Ray Tucker & Sons*, the issue was whether a limitation of liability provision in a contract for yellow pages advertising was unconscionable. We refused to address the substantive unconscionability issue because the record showed no disparity in the parties' bargaining positions. In addition, the record failed to show that the customer could not have obtained equally effective advertising elsewhere. See *id.* In general, we have been reluctant to rewrite contracts between parties experienced in business, as opposed to contracts between consumers and skilled corporate parties. See, e.g., *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002); *Darr v. D.R.S. Investments*, 232 Neb. 507, 441 N.W.2d 197 (1989).

Unconscionability presents a question of law. Usually, the issue should not be determined before the plaintiffs have an opportunity to present evidence of disparity in their bargaining positions and that the provisions unreasonably favored the defendant. See, e.g., *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989). But here, the taxpayer is asserting unconscionability on behalf of a state agency. And the pleadings and attachments conclusively refute any disparity between the parties' bargaining positions.

Regarding the NIC's bargaining position, each NIC council member "shall have at least ten years of experience in the financial affairs of a public or private organization or have at least five years of experience in the field of investment management or analysis." § 72-1238. Section 72-1240 requires the state investment officer to have at least 5 years of experience in managing investment portfolios and be well qualified to "administer and invest the money available for investment." Myers cannot

reasonably assert that these officers were in an inferior bargaining position or ill equipped to evaluate whether the benefits of the contracts justified the clearly expressed risks and fees. Myers' claim of unconscionability must fail.

### (iv) Dismissal of Westridge and WG Trading for Failure to State Cause of Action

Myers argues that if the contracts are not void ab initio, then the district court erred in concluding that he lacked standing to pursue his breach of contract claim against Westridge. In his final cause of action, Myers alleged that Westridge had breached the agreement because it knew or should have known that the NIC was prohibited from expending public funds on the WG Trading partnership. Similarly, in his third cause of action, Myers alleged that Westridge, WG Trading, Walsh, and Greenwood had breached their fiduciary duty to the State to (1) disclose that the investment contracts with the State were illegal and (2) refrain from investing the State's assets until they had obtained authorization from the Attorney General.

Myers' breach of contract allegations mirror his breach of fiduciary duties claim against Westridge and WG Trading because they could only owe fiduciary duties to the NIC through the contracts. On appeal, Myers argues that Westridge and WG Trading had an implied contractual duty to inform the NIC that the investment was illegal.

This court has implicitly recognized that a taxpayer's standing on claims of illegal expenditures extends to seeking recovery from private parties contracting with the governmental entities. See, e.g., *Lanphier v. OPPD*, 227 Neb. 241, 417 N.W.2d 17 (1987); *Fulk v. School District*, 155 Neb. 630, 53 N.W.2d 56 (1952). But a taxpayer, in pursuing a derivative action on behalf of a governmental entity, has no greater rights against a party contracting with the governmental entity than the entity itself possesses. *Lanphier v. OPPD, supra; Nielsen v. SID No. 229*, 208 Neb. 542, 304 N.W.2d 385 (1981).

The district court dismissed Myers' third cause of action for failing to state a claim. For Myers to state a claim, the NIC must have a legal claim. Thus, we analyze whether the NIC was entitled to recover from Westridge and WG Trading for failing to inform the NIC that the contracts violated Nebraska statutes.

Regarding this claim, the district court concluded: "Holsapple represented throughout all of the written agreements that the NIC was able to enter into the investment agreements. There was no duty on WG Trading, Walsh, Greenwood and Westridge . . . to independently verify those representations."

██ We believe that Myers correctly states that Westridge owed fiduciary duties to the NIC under the contract. The issue, however, is whether Myers can state a claim for breach of fiduciary duties. A broker operating a discretionary account, in which the broker determines which investments to make, is viewed as a fiduciary. *CFTC v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171 (7th Cir. 1987). Both federal regulations and Nebraska statutes define a broker dealer's fiduciary duties as follows:

> It shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
>
> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Neb. Rev. Stat. § 8-1102(1) (Reissue 1997). See, also, 15 U.S.C. § 78j(b) (2000); 17 C.F.R. § 240.10b-5 (2006).

██ Under federal law, a broker-dealer may be liable for recommending the purchase of securities that are unsuitable for an investor's, as a violation of § 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 of the federal regulations. *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 897 (10th Cir. 1992). To sustain an unsuitability claim, the investor must prove:

> (1) [T]he broker recommended (or in the case of a discretionary account purchased) securities which are unsuitable in light of the investor's objectives; (2) the broker recommended or purchased the securities with an intent to defraud or with reckless disregard for the investor's interests; and (3) the broker exercised control over the investor's account.

*Id.* at 898.

A similar claim was recently addressed by the Minnesota Supreme Court in *Minneapolis Emp. Ret. v. Allison-Williams*, 519 N.W.2d 176 (Minn. 1994). In that case, the executive director of the public employees' retirement fund had communicated the funds' investment objectives to one of its broker-dealers. The fund sought higher returns than had been generated by buying privately placed securities. The director approved the purchase of high-yield, high-risk bonds over a period of years, and the broker-dealer could not enter into the transactions without authorization. Eventually, the public corporation sued to recover losses based on claims that the broker-dealer (1) had breached its fiduciary duty, (2) sold unsuitable investments, and (3) failed to disclose material facts. The corporation alleged that the broker had a duty to obtain information regarding the fund's financial situation before recommending speculative securities.

Relying on the *O'Connor* rule, the Minnesota Supreme Court concluded that speculative trading as identified by the fund director was consistent with the corporation's investment objectives. The court determined that the corporation had failed to show a fraudulent intent or reckless disregard for the investor's interests because the director had communicated an objective to obtain greater returns by purchasing riskier securities. *Minneapolis Emp. Ret. v. Allison-Williams, supra.* This case illustrates that a broker can rely on representations made by the investor in determining whether an investment is suitable to the investor's needs and that investments consistent with those objectives do not constitute fraudulent conduct when the broker makes the investor aware of the risks.

In the WG Trading partnership contract, Holsapple represented that (1) the NIC was a sophisticated investor and experienced in business affairs; (2) all documents, records, and books pertaining to this investment were available to its attorney and its accountant; and (3) the NIC "has full power and authority to invest in the Partnership and to enter into this Partnership Agreement and to perform its obligations hereunder without the consent of any person or entity which has not heretofore been obtained." Further, the NIC acknowledged in the contract that "the Partnership has been organized to invest primarily in arbitrage and other hedged strategies but that this type of investing

is speculative and may involve a high degree of risk, including both market and credit risks."

Because of these representations, Westridge could conclude that the NIC's investment objective was to engage in speculative investment in the hope of obtaining greater returns. Similarly, the contract refutes any intention to deceive the NIC about the risks of these investments. The WG Trading contract required a limited partner, i.e., the NIC, to represent that it had authority to enter the partnership and that it had made all investment documents available to its attorney. This requirement made the NIC aware that authority was needed to enter into the contract. The district court correctly determined that Westridge could rely on the NIC's representation that it had authority to invest in the WG Trading.

Myers relies solely on a case from the New Mexico Supreme Court to argue that Westridge breached its fiduciary duties to the NIC. See *State ex rel. Udall v. Colonial Penn*, 112 N.M. 123, 812 P.2d 777 (1991). The New Mexico Supreme Court reversed a summary judgment for the investment advisor. There, the investment advisor had recommended the purchase of stock in a company that was incorporated in the Netherlands Antilles. The New Mexico Constitution restricted the investment officer's stock purchases to the stock of businesses incorporated in the United States. After purchasing the stock, the investment officer learned that the company was a foreign corporation and, suspecting that the investment was contrary to New Mexico law, contacted the attorney general's office. After the attorney general issued an opinion that the purchase was illegal, the stock was sold at a $1.2 million loss. The state alleged that the investment advisor knew the limitations on the state's stock purchases and nonetheless advised the investment officer to make the purchase. The Supreme Court concluded that the contract had incorporated New Mexico law and that the investment advisors, as fiduciaries, had a duty to advise the state to make only lawful investments. Because the record revealed factual issues as to whether the investment advisor knew of the state's constitutional limitations, the court reversed summary judgment.

We note that the court did not impute knowledge of New Mexico law to the investment advisor. Thus, we read the case as

holding that when a broker-dealer has actual knowledge of state law limitations on investing state assets, the broker-dealer has a duty to advise a state investment officer to make only investments within those limits. Here, the district court specifically stated: "Assuming, for purposes of argument, that the investment . . . was contrary to state statute, [Myers] does not argue, or plead, that WG Trading, Walsh, Greenwood and/or Westridge . . . knew that the NIC and Holsapple were exceeding their statutory authority by entering into the investment contracts."

*State ex rel. Udall* is inapplicable to Myers' allegations. We conclude that the NIC could not maintain an action against Westridge for breach of a contractual duty because the documents submitted and attached to the pleadings show that Westridge's investments were consistent with the NIC's investment objectives. Also, the investment contracts put the NIC on notice that it needed authorization to enter the contracts, and the NIC represented that it had authority. Because the NIC could not recover from Westridge for breach of a contractual duty, Myers could not recover on behalf of the NIC based on this claim.

### (v) Availability of Disgorgement Remedy Against Westridge and WG Trading

Myers argues that the court erred in dismissing Westridge and WG Trading because they were liable under the void public contracts to restore all moneys received from the State and to disgorge all profits. He argues that when a governmental entity makes a contract that is not within its powers, a private party to the contract must restore to the governmental entity all government funds and fees that it received under the contract, even when quantum meruit is permitted. In support, Myers cites *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004), but *Rath* is not supportive.

In *Rath*, we held that when a taxpayer seeks to *enjoin* an illegal expenditure of public funds, it is an inherently irreparable injury "if an action is 'void not because of a lack of power but because of a failure to properly exercise existing power.'" 267 Neb. at 280, 673 N.W.2d at 884, quoting *Fulk v. School District*, 155 Neb. 630, 53 N.W.2d 56 (1952). Although we did

not clearly distinguish between unenforceable and void contracts, the injury is irreparable when a governmental entity has failed to properly exercise its power because a taxpayer cannot recover the expenditure in that circumstance. *Rath v. City of Sutton, supra*.

The Nebraska cases cited by Myers show that a governmental entity or taxpayer may recover from a private party only when the public contract was void ab initio because the governmental entity was wholly without authority to make the contract or because a statute avoided the obligation. See, *Arthur v. Trindel*, 168 Neb. 429, 96 N.W.2d 208 (1959); *Heese v. Wenke*, 161 Neb. 311, 73 N.W.2d 223 (1955); *Fulk v. School District, supra*; *Village of Bellevue v. Sterba*, 140 Neb. 744, 1 N.W.2d 820 (1942). Moreover, none of the cases Myers cites from other jurisdictions hold that a taxpayer may seek disgorgement from a private party contracting with a governmental entity in good faith when the governmental entity had general power to make the contract.

As noted, this court has consistently held that a taxpayer, in pursuing a derivative action on behalf of a governmental entity, has no greater rights against a party contracting with the governmental entity than the entity itself possesses. See, e.g., *Lanphier v. OPPD*, 227 Neb. 241, 417 N.W.2d 17 (1987). Because we have determined that the contracts were not void ab initio, the NIC could not avoid its obligation under the contract to pay for services received. Because Myers' rights are derivative, he may not seek disgorgement from Westridge or WG Trading.

### (c) Mootness Conclusion

As discussed, Myers was required to show that sovereign immunity did not bar his requested relief and that, as a taxpayer, he had an equitable right to recover on behalf of the State. We have concluded that sovereign immunity did not bar his relief. But to recover from officials for their actions regarding a public contract, Myers must show that the contract was void ab initio. None of his claims can support that conclusion. Although the contracts were unenforceable against the State because the NIC violated a statute limiting the State's investment transactions, the

State's principal and income have been returned. We conclude that Myers' claims did not entitle him to any further relief and are therefore moot. See *Keef v. State*, 271 Neb. 738, 716 N.W.2d 58 (2006) (holding that because Congress had not validly abrogated State's 11th Amendment immunity and Legislature had repealed statute charging fee for handicapped parking placards, equitable claims for injunctive and declaratory relief were moot).

## V. CONCLUSION

We conclude that Myers has failed to show that the NIC's obligation under these investment management contracts was avoided because the NIC has general powers to enter into these types of contracts. Although the contracts were unenforceable against the State, the statutory violation did not render the contracts void ab initio. We further conclude that the investment managers could rely upon the State's representations that it had authority to enter into these contracts. Also, the contracts put the NIC on notice that legal authorization was required and that the investment strategy was risky. Because the NIC could not recover from the investment contractors under the contracts, a taxpayer in a derivative action also cannot recover from them. Finally, because the investment management companies have returned the State's principal and income, and because Myers is entitled to no further relief from the NIC or the investment managers, the claims are now moot.

AFFIRMED.

HENDRY, C.J., and WRIGHT and STEPHAN, JJ., not participating.