775 N.W.2d 413 (2009)
278 Neb. 1018
Shari MILLER, appellee,
v.
SCHOOL DISTRICT NO. 18-0011 OF CLAY COUNTY, Nebraska, also known as Harvard Public Schools, a political subdivision of the State of Nebraska, appellant.
No. S-09-016.
Supreme Court of Nebraska.
December 4, 2009.
*414 Karen A. Haase, Steve Williams, and Adam J. Prochaska, of Harding & Shultz, P.C., L.L.O., Lincoln, for appellant.
*415 Scott J. Norby, of McGuire & Norby, Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Nebraska law permits a school district to terminate the contract of a permanent certificated employee only for certain reasons.[1] One reason is a reduction in force.[2] The question presented in this appeal is whether terminating the contract of a permanent certificated art teacher who had been employed by a school district on a half-time basis and replacing her with a probationary art teacher employed by another school district and shared on a half-time basis pursuant to an interlocal agreement constitutes a reduction in force. We conclude that it does not.

BACKGROUND
For 23 years, Shari Miller was employed by School District No. 18-0011 of Clay County, commonly known as Harvard Public Schools (School District), as its art teacher. She provided art instruction to students in grades 4 through 12. In 1997, Miller's position was reduced from a .75 full time equivalency (FTE) to a .5 FTE due to low enrollment in the art program. After 1997, Miller also taught art classes in the Aurora Public Schools on a .5 FTE basis, in addition to her .5 FTE position as a certificated teacher with the School District.
At a January 14, 2008, meeting, the board of education of the School District (School Board) began discussing a possible expansion of its interlocal agreement with the Clay Center school district. Under the existing agreement, the two districts shared certain personnel, including teachers for Spanish, social studies, and industrial technology, as well as a paraprofessional and coaches. The School Board did not give public notice of the nature of the meeting because it did not want to "scare" its teachers. A short time later, the curriculum committees of both the School Board and the Clay Center school board met to discuss the possibility of sharing personnel for their art and speech pathology programs. No public notice was given, nor was an agenda issued or minutes prepared of the meeting.
At the time of these meetings, the Clay Center school district employed its own tenured 1.0 FTE art teacher. However, on February 3, 2008, that teacher submitted her resignation, effective at the end of the school year. On February 13, the Clay Center school district's superintendent, Lee Sayer, informed the Clay Center school board of the resignation and stated, "[The School District] wants to share [the art] position with us for next year, but we will need to hire a replacement teacher for next year. . . . This needs to be confidential because [the School District] is going to RIF their art teacher who resides in Clay Center, and is unaware of this action." (Emphasis in original.) The Clay Center school district advertised the full-time art teacher position for the 2008-09 school year and eventually hired a person who had been teaching in Kansas. Miller saw the position advertised but did not apply for it. Sayer did not discuss the position with Miller, because he thought it was "illegal" to contact teachers under contract with another school. The School District's superintendant, Larry Turnquist, did not inform Miller of the position or *416 advise her to apply, because he felt the hiring decision was the responsibility of the Clay Center school district.
On February 20, 2008, in an e-mail message to the School Board, Turnquist outlined the process for terminating Miller's contract, stating that the School Board would first need to vote to eliminate the art program. Turnquist also stated:
The teacher may ask for a hearing, but, the curriculum is totally in the hands of the board so if a hearing is called, it will be used as an opportunity by the teacher and the teacher's union (NEA) to intimidate the board. They know that once the board vote[s] to reduce, it is all over.
In follow up communications with the School Board, Turnquist warned that the decision to eliminate the art program may be challenged and he recommended that the School Board cite only the Clay Center school district's offer to share its art teacher as the change in circumstance necessitating a reduction in force, rather than "create a school wide level of fear" with talk of budgetary concerns.
When Sayer advised Turnquist that the Clay Center school district had hired an art teacher for the 2008-09 school year, Turnquist requested a formal proposal for the sharing arrangement they had been discussing. Sayer then sent Turnquist a letter dated February 28, 2008, formally proposing that the two school districts share the art teacher position on a .5 FTE basis.
On March 3, 2008, Turnquist gave Miller written notice that the School District was considering a reduction in force which would eliminate her position and that the School Board would discuss the matter at a meeting scheduled for, and subsequently held on, March 10. Miller was invited to the meeting but, on the advice of her union representative, she did not attend. At the meeting, the School Board voted unanimously to reduce the School District's art program from .5 FTE to 0 FTE and recommended that the School District contract with the Clay Center school district for the provision of an art teacher.
Following notification of her proposed contract termination, Miller requested a hearing before the School Board which took place on July 21, 2008. Following the hearing, the School Board found that the following changes in circumstance necessitated a reduction in force:
[T]he need for the [S]chool [D]istrict to be more efficient in the use of its resources, the increasing cost of operating the [S]chool [D]istrict, the reduced financial support for the [S]chool [D]istrict, the uncertainty of state aid, limitations on the [S]chool [D]istrict's ability to levy property taxes, statutory budgetary limits, the low student enrollment in [the School District], the low enrollment in the Art program [in the School District], and the opportunity for the [School] Board . . . to contract with the Board of Education of Clay Center Public Schools for the provision of Art instruction services.
The School Board also found that the change in circumstances specifically related to Miller, as her only teaching endorsement was in art and she did not qualify for any other vacancies in the district.
Miller filed a petition in error in the district court for Clay County, generally alleging the School Board's decision violated the reduction in force statutes, because it was not supported by competent evidence regarding a change in circumstances necessitating a reduction in force and allowed for the retention of a probationary employee to render services for which Miller was qualified to perform. At the hearing, Turnquist testified regarding the circumstances which led to Miller's *417 termination, as summarized above. Turnquist admitted that under its proposed course of action, the only change in the district's art program would be the identity of the art teacher and a savings of approximately $8,785 as a consequence of replacing Miller with the shared probationary teacher employed by the Clay Center school district. Turnquist further conceded that cost savings would be approximately the same if the School District were to hire a new probationary teacher to replace Miller.
Following the hearing, the district court issued an order reversing and vacating the decision of the School Board. The court found that there had been no change in circumstances or reduction in force because the School District did not reduce its staff or demonstrate a reduced need. The School District perfected this timely appeal, which we moved to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[3]

ASSIGNMENTS OF ERROR
The School District assigns, restated and consolidated, that the district court erred in determining that (1) there was not a change in circumstances necessitating a reduction in force and (2) the School District's termination of Miller's contract was not a reduction in force.

STANDARD OF REVIEW
The standard of review in a proceeding in error from an order of a school board terminating the contract of a tenured teacher is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision.[4] The evidence presented to a school board is sufficient as a matter of law if the school board could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it.[5]
Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.[6]

ANALYSIS
As a permanent certificated employee, Miller had a certain degree of job security guaranteed by law. But her contract could be terminated for one of the reasons specified in § 79-829, including reduction in force. Because this was the sole reason given for the termination, we must first resolve the disputed issue of whether the School District's agreement to share an art teacher with another district constituted a reduction in force. The district court found that the School District had a .5 FTE art teacher both before and after the purported reduction in force. The district court further found:
[The School District's] curriculum was not changed, its staffing needs did not change; consequently, there was NO reduction in force. The only change was a lower overall cost because the . . . School Board agreed to utilize another teacher at a lower rate of pay by sharing her salary with the Clay Center Board of Education. The . . . School District "RIF" reduced its costs by replacing a teacher with 23 years of experience with *418 a probationary teacher from another school district who could be obtained at a bargain.
In assigning error to this finding, the School District argues that there "has clearly been a reduction in force at [the School District] as the number of teachers employed by the district has been reduced."[7] The School District further argues that it made a transparent decision "to cease providing art to its students through district employees and to begin doing so through a cooperative agreement in order to save money."[8] It contends that its authority to do so is entitled to the traditional deference which this court has given to school boards in making this type of decision.[9]
The threshold question we must address in this case is not whether the School District properly exercised its broad discretion in carrying out a reduction in force, but, rather, whether a reduction in force actually occurred. If it did, then we must decide whether it was carried out in the manner which the statutes require. But if there was no reduction in force, the School District's stated reason for terminating Miller's contract would disappear.
We have previously held that the intent of the tenured teacher statutes, including § 79-829, is to guarantee a tenured, or permanent certificated, teacher continued employment except where specific statutory grounds for termination are demonstrated.[10] Section 79-829(2) provides that a teacher's contract may be terminated due to "reduction in force as set forth in sections 79-846 to 79-849." Although the statute does not specifically define the phrase "reduction in force," this court has held that as used in the teacher tenure statutes, it "involves terminating a teacher['s contract] `due to a surplus of staff.'"[11] School districts are statutorily required to adopt reduction in force policies, and "[n]o such policy shall allow the reduction of a permanent or tenured employee while a probationary employee is retained to render a service which such permanent employee is qualified . . . to perform . . . ."[12] Section 79-847 provides:
Before a reduction in force occurs, the school board or board of education and the school district administration shall present competent evidence demonstrating that a change in circumstances has occurred necessitating a reduction in force. Any alleged change in circumstances must be specifically related to the teacher or teachers to be reduced in force, and the board, based upon evidence produced at the hearing required by sections 79-824 to 79-842, shall be required to specifically find that there are no other vacancies on the staff for which the employee to be reduced is qualified by endorsement or professional training to perform.
By enacting these statutes, "`the Legislature has attenuated a school [district's] *419 discretion to pare its staff in the face of reduced needs and has imposed specified procedures for achieving a reduction in force.'"[13]
Applying these principles, we have held that a reduction in force occurred where a community college eliminated its machine shop program due to a decline in enrollment and decided not to renew the contract of the sole machine shop instructor, and no new teacher was hired to fill a position for which the former machine shop instructor was qualified.[14] But we determined that no reduction in force occurred where a teacher was told that her position had been eliminated, and the school district subsequently hired a new teacher to fill a position for which the discharged teacher was qualified.[15]
We conclude that the district court correctly determined that no reduction in force occurred in this case. There was no "surplus" of staff in the art department, i.e., "the amount that remains when use or need is satisfied,"[16] as evidenced by the fact that the School District planned to replace its only .5 FTE art teacher with another .5 FTE art teacher. The School District was not paring its staff to meet reduced needs; it was changing the method by which it secured the services of a .5 FTE art teacher in order to save money. The School District would have paid its share of the new teacher's salary and fringe benefits, but the amount would have been less than it had paid Miller, primarily because the shared teacher held probationary status and earned a lower salary. We note that the School District would have been legally prohibited by Nebraska's teacher tenure statutes from terminating Miller's contract and then hiring a probationary teacher to replace her.[17] A governmental entity may not accomplish indirectly what it is prohibited from doing directly, whether prohibited by constitutional or statutory provisions.[18]
The School District urges us to follow other state courts which have upheld termination of tenured teachers' contracts in circumstances where their duties were assumed by other personnel. We have reviewed the cases cited by the School District and find them to be distinguishable, in that none involved "reduction in force" as a statutory basis for termination of a teacher's contract and all involved factual circumstances which are different in varying degrees from this case. The School District's core argument is that it should be free to structure its workforce in the most economical way possible, in this case, through an interlocal agreement for the sharing of a teacher with another school district. It may well be that under certain circumstances, a teacher-sharing arrangement between school districts would be an appropriate and effective means of controlling costs and conserving scarce resources. But under Nebraska law, reduction of personnel cost is not itself a legal basis for terminating the contract of a tenured teacher; the savings must be achieved by a reduction in force. *420 The district court correctly concluded that no reduction in force occurred in this case.

CONCLUSION
For the reasons discussed, we affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] See Neb.Rev.Stat. § 79-829 (Reissue 2008).
[2] § 79-829(2) and Neb.Rev.Stat. §§ 79-846 to 79-849 (Reissue 2008).
[3] Neb.Rev.Stat. § 24-1106(3) (Reissue 2008).
[4] See, Wilder v. Grant Cty. Sch. Dist. No. 0001, 265 Neb. 742, 658 N.W.2d 923 (2003); Nickel v. Saline Cty. Sch. Dist. No. 163, 251 Neb. 762, 559 N.W.2d 480 (1997).
[5] See id.
[6] Metropolitan Comm. College Area v. City of Omaha, 277 Neb. 782, 765 N.W.2d 440 (2009). See, also, Wilder v. Grant Cty. Sch. Dist. No. 0001, supra note 4.
[7] Brief for appellant at 33.
[8] Id. at 31.
[9] See, Nickel v. Saline Cty. Sch. Dist. No. 163, supra note 4; Cross v. Board of Governors, 204 Neb. 383, 281 N.W.2d 925 (1979).
[10] See, Moser v. Board of Education, 204 Neb. 561, 283 N.W.2d 391 (1979); Witt v. School District No. 70, 202 Neb. 63, 273 N.W.2d 669 (1979).
[11] Roth v. School Dist. of Scottsbluff, 213 Neb. 545, 548, 330 N.W.2d 488, 491 (1983) (superseded by statute on other grounds as stated in Kennedy v. Board of Ed. of Sch. Dist. of Ogallala, 230 Neb. 68, 430 N.W.2d 49 (1988)), quoting Moser v. Board of Education, supra note 10.
[12] § 79-846.
[13] Wilder v. Grant Cty. Sch. Dist. No. 0001, supra note 4, 265 Neb. at 747, 658 N.W.2d at 927, quoting Trolson v. Board of Ed. of Sch. Dist. of Blair, 229 Neb. 37, 424 N.W.2d 881 (1988).
[14] Cross v. Board of Governors, supra note 9.
[15] Witt v. School District No. 70, supra note 10.
[16] Webster's Third New International Dictionary, Unabridged 2301 (1993).
[17] See, § 79-846; Moser v. Board of Education, supra note 10.
[18] Myers v. Nebraska Invest. Council, 272 Neb. 669, 724 N.W.2d 776 (2006).